# In the
# United States Court of Appeals
## For the Seventh Circuit

No. 04-4318

J. RICHARD TANNER,

*Plaintiff-Appellant,*

*v.*

JUPITER REALTY CORPORATION,

*Defendant-Appellee.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 04-C-1504—**James F. Holderman**, *Judge.*

ARGUED MAY 31, 2005—DECIDED JANUARY 5, 2006

Before EASTERBROOK, ROVNER, and WOOD, *Circuit Judges.*

WOOD, *Circuit Judge.* From March 2002 to June 2003, J. Richard Tanner worked as an Asset Manager in the Atlanta office of Jupiter Realty Corporation (Jupiter), a Chicago-based commercial real estate company. Shortly after Tanner expressed some concerns about one of the company's loans, Jupiter fired him. Believing that this action was in retaliation for his whistle-blowing, Tanner sued, invoking the federal court's diversity jurisdiction. Applying Georgia law to the claim, the district court granted summary judgment for Jupiter. We affirm.

**I**

On several occasions in April and May 2003—about two months before the alleged whistle-blowing activity began—Jupiter informed Tanner that it might close its Atlanta office. On May 27, 2003, Kevin Moyer, a Vice President and the Manager of Jupiter's Atlanta office, told Tanner that the company had finalized its decision to do so. Tanner learned at the same time that he was going to lose his job as of July 25, 2003, because Jupiter planned to transfer all of Tanner's accounts to Sonya Michieli, who was about to move to Chicago from Jupiter's Denver office, which was also slated for abandonment.

Meanwhile, in June 2003, Jupiter decided to sell two properties that Tanner had been managing: 3875 Faber Place and 3955 Faber Place. G.E. Capital was the lender for those properties. Jupiter's loan agreement with G.E. Capital made special provision for taxes that had to be paid when Jupiter sold property to a third party. The critical language in the agreement required Jupiter to repay its loan to G.E. Capital according to the following rules:

> [G.E. Capital receives] 100% of the net sales or net refinancing proceeds for such Project received by Borrower less an amount equal to the assumed income taxes on any gain, if any, payable by Borrower as a result of the sale or refinancing triggering this release; provided, that Borrower shall provide to Lender upon request all information reasonably requested by Lender to evidence the amount of income taxes described above.

On June 3, Jeremy Glendenning, Jupiter's Portfolio Manager, sent Moyer an email that included a worksheet reflecting Jupiter's plans to use the retained amount from the proceeds of the sales of the Faber properties to pay down its equity investment in the properties rather than to pay the taxes. Moyer forwarded the email to Tanner, who became concerned with Jupiter's proposed use of the money.

Tanner later stated that he was also concerned that Jupiter had overstated its tax liability, apparently as a way of holding back more money from G.E. Capital than it should have done.

This concern prompted Tanner to send an email to Moyer on June 13, 2003, in which he expressed his concern about several issues related to Jupiter's responsibilities to G.E. Capital and his desire to speak to Moyer about it when Tanner returned from vacation on June 23, 2003. The opportunity to talk to Moyer arose almost immediately. On June 25, 2003, Moyer and Tanner traveled from Atlanta to Greenville, South Carolina, for a meeting with Jupiter employees from Chicago, including Jerry Ong, one of Jupiter's Executive Vice Presidents. The purpose of the meeting was to facilitate the transfer of Tanner's portfolio to Michieli. On the way to the meeting, Tanner explained to Moyer what concerned him about the computation of the tax sale gains on the Faber properties. It is fair to say that the conversation did not have the effect Tanner was hoping for. Once in Greenville, Moyer spoke with Ong about his conversation with Tanner. The two men inferred that Tanner was trying to extort money from Jupiter and that he was a threat to the company. They decided that Tanner should not be allowed to return to Jupiter's office. Nonetheless, they also decided to pay him through July 25, 2003, and give him one week of severance pay. On the car ride back, Moyer gave Tanner the bad news. Evidently prepared for it, Tanner responded that he had already packed his belongings from his office.

On February 25, 2004, Tanner filed a complaint against Jupiter alleging retaliatory discharge, invoking the federal court's diversity jurisdiction. On November 24, 2004, the district court granted Jupiter's motion for summary judgment. Applying Illinois's choice of law rules, the court concluded that the substantive law of Georgia applied to Tanner's claim. That made the decision to rule for

Jupiter easy, since Georgia does not recognize the common law tort of retaliatory discharge. Alternatively, the court found that even if Illinois law applied, it would still grant summary judgment for Jupiter because Jupiter had decided to terminate Tanner's employment well before Tanner made known his concerns about Jupiter's alleged wrongdoing, and the latter events had no effect on Tanner's final day of work or pay.

## II

We review a district court's grant of summary judgment *de novo*. *Copeland v. County of Macon*, 403 F.3d 929, 932 (7th Cir. 2005). Summary judgment is proper if "there is no genuine issue as to any material fact and [ ] the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c); see also *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). In conducting our review, we take all facts in the light most favorable to the non-moving party. *Ezell v. Potter*, 400 F.3d 1041, 1046 (7th Cir. 2005). We review a district court's application of choice of law principles *de novo*. *Gramercy Mills, Inc. v. Wolens*, 63 F.3d 569, 572 (7th Cir. 1995).

When a district court sits in diversity, it must apply the choice of law principles of the forum state to determine which state's substantive law governs the proceeding. *French v. Beatrice Foods Co.*, 854 F.2d 964, 966 (7th Cir. 1988) (citing *Klaxon Co. v. Stentor Electric Mfg. Co.*, 313 U.S. 487, 496 (1941)). In this case, as the district court did, we look to Illinois's choice of law rules. For tort actions, Illinois instructs the court to ascertain the forum with the "most significant relationship" to the case. *Esser v. McIntyre*, 661 N.E.2d 1138, 1141 (Ill. 1996). "Under this test, the law of the place of injury controls unless Illinois has a more significant relationship with the occurrence and with the parties." *Id.* Four factors are supposed to guide the

court's decision: "(1) where the injury occurred; (2) where the injury-causing conduct occurred; (3) the domicile of the parties; and (4) where the relationship of the parties is centered." *Id.* The court evaluates these factors "in light of the policies underlying the laws of those jurisdictions." *Id.* (internal citations omitted).

Looking at these factors, we agree with the district court that a strong case can be made for applying Georgia law. Tanner was employed in Jupiter's Atlanta office and was fired from that office on May 27, 2003, when Jupiter informed him that it was closing the office. If instead we chose to look at the place where Moyer told him to pack up and leave, it would be either Georgia or possibly South Carolina during the drive back to the office. Next, we look at where the conduct that caused the injury occurred. See, *e.g.*, *French*, 854 F.2d at 966 (considering the location of the actual loss of the job, the cause of the termination, and the events leading up to the termination). Tanner learned that he was going to lose his job on May 27, 2003, when Moyer told him that the Atlanta office would be closing. This conversation took place in Georgia. Even if we accept Tanner's assertion that his discharge occurred on June 25, 2003, the conduct leading to the discharge did not take place in Illinois. Tanner sent his June 13, 2003, email to Moyer in Georgia and his conversation with Moyer on the way to Greenville occurred in either Georgia or South Carolina. As is often the case, the domicile factor is not very helpful: Tanner was domiciled in Georgia, and Jupiter in Illinois. Last, we consider where the relationship of the parties is centered. Tanner's employment relationship with Jupiter was located primarily in Atlanta. Although the Chicago office directed his employment activities and the decision to close the Atlanta office was made in Chicago, Georgia was the location of the alleged injuries and where Tanner worked for the duration of his tenure with Jupiter.

On the assumption that Georgia law applies, Tanner's case is doomed at the outset. Georgia does not recognize the tort of retaliatory discharge. See *Reilly v. Alcan Aluminum Corp.*, 528 S.E.2d 238, 240 (Ga. 2000) ("[T]he inability of an at-will employee to sue in tort for wrongful discharge is a fundamental statutory rule governing employer-employee relations in Georgia."); see also *Evans v. Bibb Co.*, 342 S.E.2d 484, 486 (Ga. Ct. App. 1986) (declining to create a common law wrongful discharge claim based on a plaintiff's filing of a worker's compensation claim).

We recognize, however, that several of the factors give some support to a finding that Illinois law applies. Jupiter was an Illinois corporation with its principal place of business in Illinois, and Tanner argues that the firm directed everything from Illinois. Even if we were to find that Illinois law applies, however, Tanner still loses. First, we think it unlikely that Illinois would recognize a cause of action for retaliatory discharge on these facts. Three years after first recognizing the tort of retaliatory discharge, the Illinois Supreme Court explained that to be actionable, the "matter must strike at the heart of a citizen's social rights, duties, and responsibilities before the tort will be allowed." *Palmateer v. International Harvester Co.*, 421 N.E.2d 876, 878-79 (Ill. 1981). While Illinois may recognize a cause of action for an employee who reports corporate fraud or mismanagement, see *Johnson v. World Color Press, Inc.*, 498 N.E.2d 575, 576 (Ill. App. Ct. 1986) (allowing a claim based on a employee's disagreement with accounting practices to go forward), it is unlikely to do so when a close look at the allegations shows that no corporate misconduct has been described. Here, Jupiter's decision to use the Faber properties' sale proceeds to pay down their equity investment had no effect at all on its tax liability to the government. It just meant that it would satisfy that liability with a different package of dollars than the one it received in conjunction with the sale. Nor is it readily apparent how

G.E. Capital could have been harmed by this arrangement. The loan agreement expressly gave G.E. Capital the right to request any information from Jupiter used "to evidence the amount of income taxes" related to Jupiter's tax liability calculation. Given these protections, G.E. Capital (surely a sophisticated party) easily could have demanded proof that the amount withheld for taxes was proper.

The materials gathered for the summary judgment motion show that Jupiter terminated Tanner on May 27, 2003, when it told him that the Atlanta office would be closing and his portfolio was being assigned to another person. Any way one considers it, Tanner has not shown that there are genuine issues of fact that might allow him to prevail.

We AFFIRM the judgment of the district court.

A true Copy:

      Teste:

_____

*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*
