In the

# United States Court of Appeals
## For the Seventh Circuit

———————

No. 07-1006

LAWRENCE B. LEVY, M.D.,

*Plaintiff-Appellant,*

*v.*

MINNESOTA LIFE INSURANCE COMPANY,
formerly known as Minnesota
Mutual Life Insurance Company,

*Defendant-Appellee.*

———————

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 03 C 5141—**Sidney I. Schenkier,** *Magistrate Judge.*

———————

ARGUED DECEMBER 5, 2007—DECIDED FEBRUARY 25, 2008

———————

Before FLAUM, EVANS, and WILLIAMS, *Circuit Judges.*

EVANS, *Circuit Judge.* In this insurance dispute, the
plaintiff, Dr. Lawrence B. Levy, and the defendant,
Minnesota Life Insurance Company (MLI), agree that
Levy suffers from osteoarthritis in his right knee, which
prevents him from performing his occupational duties
and qualifies him for disability coverage under two policies
issued by MLI. The parties disagree, however, on which
provision of the policies applies, which, in turn, affects the
duration of coverage. Levy claims that he qualifies for
coverage under the "injury" provision, which entitles him
to lifetime disability benefits. MLI, on the other hand,

claims that Levy qualifies for coverage under the "sickness" provision, which only entitles him to benefits he has received for the 6-year period that ended after he turned 65 years old in 2003.

The district court (Magistrate Judge Sidney Schenkier, sitting with the parties' consent, 28 U.S.C. § 636(c)) resolved the parties' cross-motions for summary judgment in favor of MLI. The case is now before us on Levy's appeal. We review a grant of summary judgment *de novo*. *Tanner v. Jupiter Realty Corp.*, 433 F.3d 913, 915 (7th Cir. 2006). Summary judgment is proper if "there is no genuine issue as to any material fact and [ ] the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).

The facts are without genuine dispute. In the early 1980s, MLI issued two disability insurance policies to Dr. Levy. The policies define "disability" and "disabled" to mean that "due to sickness or injury you are unable to perform the substantial and material duties of your regular occupation." The policies define "injury" as "[a]n accidental bodily injury you sustained while this policy is in force" and "sickness" as "[a] disease or illness which is diagnosed or treated while this policy is in force." The policies provide a maximum benefit period to age 65 if the insured is disabled due to a "sickness" but lifetime benefits if the disability is due to an "injury."

In 1987, Levy claims to have injured his right knee while playing basketball at a picnic. He experienced pain for 2 or 3 weeks, which he self-treated with anti-inflammatories. Levy did not seek medical treatment for his knee until 1989, at which point he was examined by Dr. Bruce Hallmann, an orthopedic surgeon.

In February 1989, Dr. Hallmann performed arthroscopic surgery on Levy's right knee on an outpatient basis. His preoperative diagnosis was "[i]nternal derangement—right

knee." His post-operative diagnosis was "[c]omplex degenerative tear of posterior horn of medial meniscus, [and] advanced chrondromalacia[.]" Dr. Hallmann noted that Levy "had a long history of problems with his right knee," and "has had progressive difficulties with pain and clicking at the right knee." Dr. Hallmann also wrote that Levy had "apparently injured the right knee many years ago, but underwent no specific therapeutic intervention." Dr. Hallmann's notes do not mention the 1987 basketball incident.

In his deposition, Dr. Hallmann explained that the reference in his report to a "long history" of right knee problems did not mean "a problem two years before [the 1989 surgery]" because he "would have probably indicated that" in his notes. Rather, he stated that "[w]hen I say a long history of many years, I don't usually mean just a year or two. It's usually longer than that." Dr. Hallmann also testified that "[i]ndividuals can develop degenerative meniscal cartilage tears in association with osteoarthritis." He described Levy's degenerative tear at the time of the 1989 surgery as follows:

> This was not a fresh meniscal cartilage tear. It wasn't a matter that the cartilage had a very clear and clean—it was not a clean or clear cartilage tear. The cleavage planes were not well defined. They had already become degenerated. They had become frayed, fibrillated, [of] irregular character and contour. So this was not a recent tear of the medial meniscus. [A]nd, in fact, degenerative changes had already taken place at the tear site.

Dr. Hallmann further stated that he was unable to determine, based on his medical records, whether the degenerative meniscal tear noted in his report was the result of a specific trauma or a degenerative process such as osteoarthritis.

About 3 weeks after the arthroscopic surgery, Levy returned to work and resumed his normal duties as a physician. Levy continued to work for the next 7 years, during which time he did not seek medical diagnosis or treatment for his knee.

During the early 1990s, Levy's coverage under MLI's policies lapsed due to nonpayment of premiums. To obtain reinstatement of coverage, Levy made several certifications regarding his medical condition. On four occasions during 1992 to 1994, Levy certified that he "ha[d] not suffered a disability, been injured or sick" since the end of the policies' premium payment grace periods. In a 1994 application for life insurance coverage with MLI, Levy also certified that he had made a "*Full Recovery*" from his arthroscopic surgery and had experienced "no problems since."

In 1980, a little over a year before the policies here were issued, Dr. Levy worked at the Flashner Medical Group, which he described as an "urgent and immediate care" facility with offices in Mount Prospect and Arlington Heights, Illinois. Levy stopped working for the Flashner Group on June 30, 1994, when it was sold to the New York Life Insurance Company. Levy did not practice for a year after the buyout because, apparently, he received, as part of the Flashner buyout, a year's salary from New York Life. When the year ran out, Levy took a position as an independent contractor (with a group, Wexford Health Services) providing medical services for the Illinois Department of Corrections at its Dwight Correctional Center, a maximum security prison in Dwight, Illinois, some 60 miles south of downtown Chicago. He held that spot for 6 months, until February 29, 1996, when a new contractor took over his duties at Dwight. On that day, Levy was 58 years old. He has not worked since that day.

Two months after leaving Dwight, Levy submitted a disability claim to MLI in which he claimed to be disabled

due to right knee pain. When MLI requested documentation in support of his claim, Levy sought medical attention from Dr. Chadwick Prodromos, an orthopedic surgeon.

After examining Levy, Dr. Prodromos diagnosed him with "Right knee DJD versus medial meniscal injury."[1] Dr. Prodromos also obtained an MRI on Levy's right knee from a radiologist, Dr. Paul Backas. Dr. Backas reported that the MRI showed "[t]hinning, altered signal intensity and medial subluxation of body medial meniscus consistent with degenerative change with no macromeniscal tear identified[2]." Dr. Prodromos' notes state that the MRI "would appear to be consistent with DJD and not internal derangement." In the same note, Dr. Prodromos stated that, based on his review of Dr. Hallmann's report, "[b]oth the diagnosis and the procedure at that time certainly were consistent with [Levy's] current advanced degenerative joint disease."

In May 1996, Dr. Prodromos signed an Attending Physician Statement (APS), diagnosing Levy with right knee osteoarthritis and limiting him to sedentary work. The APS was used as the proof of loss that Levy submitted to MLI regarding his disability. Dr. Prodromos examined Levy on four additional occasions during 1997 through 2002. He completed six supplemental APS forms, each repeating his diagnosis of osteoarthritis/ degenerative joint disease.

In his deposition, Dr. Prodromos testified regarding the origin or cause of Levy's osteoarthritis. He first opined

---

[1] "DJD" is short for "degenerative joint disease." Dr. Prodromos testified that he uses the terms "osteoarthritis" and "degenerative joint disease" interchangeably.

[2] Based on his review of the report, Dr. Prodromos stated that the correct term was "micromeniscal," not "macromeniscal," tear.

that "Dr. Levy's basketball injury caused the meniscal tear on which Dr. Hallmann operated" and that "his knee arthritis was caused by the meniscal tear." Dr. Prodromos gave a more comprehensive explanation shortly thereafter:

> It is my opinion to a reasonable degree of orthopaedic surgical certainty that his severe right knee pain was—is directly attributable to the meniscal tear, indirectly. When I saw him he wasn't hurting because of a meniscal tear. It was occurring because the meniscal tear had caused the sequence of events of articular cartilage damage and arthrosis and pain in his knee.

Dr. Prodromos also stated that "[a]ll meniscal tears are caused by trauma, even so-called degenerative tears."

In 2005, Dr. David Waldram, an orthopedic surgeon consulted by MLI, concurred with the diagnosis of osteoarthritis/degenerative joint disease based on his review of Levy's medical records and the testimony of Drs. Hallmann and Prodromos. Dr. Waldram further opined that Levy's osteoarthritis "is not in all medical probability related to the injury of 1987." According to Dr. Waldram, the 1989 operation report contains findings consistent with degenerative arthritis and a degenerative meniscal tear, and these degenerative changes predated the 1987 basketball injury.

Dr. Waldram also pointed to other medical evidence that Levy's arthritis was not caused by the 1987 basketball incident. For example, Dr. Waldram stated that osteoarthritis typically presents unilaterally and asymmetrically. Thus, the fact that Levy's arthritis appears in his right knee does not support that the arthritis was caused by an injury to the right knee. Dr. Waldram also stated that Levy has symptoms of osteoarthritis in other areas of his body not involved in the 1987 incident— namely, his spine, left knee, and right hip. Dr. Waldram

indicated that Levy's right hip arthritis could not be related to overcompensation on account of the right knee arthritis because overcompensation would occur on the opposite side.

MLI initially declined Levy's disability claim on the basis that the policies had lapsed due to nonpayment of premiums. After Levy filed suit, the parties settled the coverage dispute and, consequently, MLI paid $7,000 a month in disability benefits to Levy from July 31, 1997, through June 11, 2003 (the policies' first anniversary date after Levy's 65th birthday).[3] The parties did not settle—and specifically reserved the right to adjudicate—the legal question of whether Levy's disability falls within the policies' "sickness" or "injury" coverage.

Under Illinois law,[4] an insurance policy is subject to the general rules governing the interpretation of other types of contracts. *Hobbs v. Hartford Ins. Co. of the Midwest*, 823 N.E.2d 561, 564 (Ill. 2005). Our primary objective is to ascertain the intent of the parties, as expressed in the policy's language. *Gillen v. State Farm Mut. Auto. Ins. Co.*, 830 N.E.2d 575, 582 (Ill. 2005). We construe the policy as a whole, giving unambiguous words their plain, ordinary, and popular meaning. *Outboard Marine Corp. v. Liberty Mut. Ins. Co.*, 607 N.E.2d 1204, 1212 (Ill. 1992). Words are ambiguous only if they are susceptible to more than one reasonable interpretation. *USF&G v. Wilkin Insulation Co.*, 578 N.E.2d 926, 930 (Ill. 1991). In that case, they will be construed against the drafter. *Id.* Nevertheless, we are not to adopt a "strained, forced, unnatural, or unreasonable construction, or one which

---

[3] This means Levy has already received about a half a million dollars in benefit payments from MLI.

[4] There is no dispute that the substantive law of Illinois applies in this diversity action.

would lead to an absurd result[.]" *U.S. Fire Ins. Co. v. Hartford Ins. Co.*, 726 N.E.2d 126, 128 (Ill. App. Ct. 2000).

The policies define "injury" as "[a]n accidental bodily injury you sustained while this policy is in force" and "sickness" as "[a] disease or illness which is diagnosed or treated while this policy is in force." Levy's 1987 basketball incident qualifies as an "injury," and his 1996 diagnosed condition of osteoarthritis qualifies as a "sickness" under the policies. However, the policies only provide coverage if the insured is "disabled," meaning that, "due to sickness or injury, [the insured is] unable to perform the substantial and material duties of [his] regular occupation."

MLI argues that this definition places the focus on the condition that renders the insured unable to work. Determining coverage based on the disabling condition, it argues, reflects the reasonable expectation of the parties. When a "sickness" prevents the insured from working, benefits for that disability are capped at age 65. MLI asserts that Levy was not unable to work due to his 1987 sports injury or even his 1989 degenerative meniscus tear. Rather, he became unable to work in 1996 due to degenerative joint disease. Thus, because Levy's disability was caused by ("due to") a "sickness," not an "injury," only the policies' sickness coverage applies.

Levy, however, claims that the phrase "due to" is ambiguous because it was left undefined by MLI. Because of this ambiguity, Levy argues that we are required to adopt his definition of "due to"—namely, "proximate cause." It is important to remember, however, that a term or phrase is not ambiguous simply because it is undefined. Only when a term is susceptible to more than one reasonable interpretation is it ambiguous. The district court found that the phrase "due to" was not ambiguous because, although there were other *possible* interpretations (such as "proximate cause"), only one interpretation ("immedi-

ate cause") was *reasonable* when the policies were viewed as a whole. For the moment, however, we will assume that "due to" is ambiguous and construe it as creating a proximate cause standard, as Levy advocates.

Illinois law defines "proximate cause" as "[any] cause which, in natural or probable sequence, produced the injury complained of. [It need not be the only cause, nor the last or nearest cause. It is sufficient if it concurs with some other cause acting at the same time, which in combination with it, causes the injury.]" Illinois Pattern Jury Instructions—Civil, No. 15.01 (2006 ed.). Thus, for Levy to prevail, he must raise a genuine issue of fact as to whether the 1987 basketball injury was a proximate cause of his inability to perform his normal duties as a physician. MLI argues that Levy falls short of meeting this requirement. We agree.

Dr. Hallmann, the first medical profession to treat Levy (almost 2 years after the injury), testified that the meniscal tear he repaired in 1989 was not "fresh" or "recent." He opined that Levy "apparently injured his right knee many years before" the surgery. Dr. Hallmann also testified that he could not determine whether the degenerative meniscus tear noted in his report was the result of a specific trauma or a degenerative process such as osteoarthritis. Not insignificantly, as we previously mentioned, Dr. Hallmann's medical notes make no mention at all of the 1987 basketball incident.

Dr. Waldram concurred with Dr. Hallmann's testimony that the degenerative changes predated the basketball injury. He specifically opined that, based on his review of the reports and testimony, Levy's arthritis "is not in all medical probability related to the injury of 1987." Levy argues that Dr. Waldram's testimony is not competent because he was retained by MLI and has no facts to support his opinion. However, Dr. Waldram did not simply

speculate regarding the cause of Levy's arthritis. Besides reviewing reports and testimony, he also pointed to medical evidence that Levy's arthritis was not caused by the 1987 basketball injury. For example, Dr. Waldram testified that osteoarthritis typically presents unilaterally and asymmetrically, casting doubt upon Levy's contention that his right knee arthritis was caused by a right knee injury.

Dr. Prodromos' testimony was the most complex. On cross-examination, he did opine that the basketball injury caused the meniscal tear, which, in turn, caused the arthritis.[5] However, Dr. Prodromos' subsequent testimony emphasized that Levy's *inability to work* was not caused by a meniscal tear but osteoarthritis: "When I saw him he wasn't hurting because of a meniscal tear. It was occurring because the meniscal tear had caused the sequence of events of articular cartilage damage and arthrosis and pain in his knee." Consequently, Dr. Prodromos described the link between Levy's meniscal tear and his arthritis as "indirect."

Dr. Levy's own testimony links the 1987 injury to his disability. But he acknowledged that he lacks the appropriate medical expertise to diagnose or treat meniscal tears such as the one he sought treatment for in 1989. Furthermore, his previous statements refute his testimony. On four occasions between 1992 and 1994, Levy certified that he "ha[d] not suffered a disability, been injured or sick" during those periods. In a 1994 application for life insurance coverage with MLI, Levy also certified that he had made a "*Full Recovery*" from his arthroscopic

---

[5] It should be noted that Dr. Prodromos also testified that Levy "went out of his way to tell me that [his disability] was caused by an injury"—a fact Levy did not emphasize to his first orthopedic surgeon, Dr. Hallmann.

surgery and had experienced "no problems since." In the 1996 claim he submitted to MLI, Levy stated that the pain and limited motion in his knee that occurred at the time of the 1987 injury persisted for only 2 or 3 weeks and then subsided for several months until the pain returned "with no apparent precipitating event." Thus, Levy presented scant evidence that his disabling condition had its roots in an isolated, 10-year-old, sports injury.

Even if we assume the 1987 basketball injury caused the meniscal tear, the evidence is insufficient to show that the injury *proximately* caused Levy's disability. It is critical that, after the 1989 surgery, Levy not only admitted to making a full recovery but continued to perform his normal duties as a physician for 7 years, during which time he never sought medical diagnosis or treatment for his knee. Only when he developed osteoarthritis did he become unable to work. Thus, even under a proximate cause analysis, the alleged injury is too speculative and remote. *See* W. Page Keeton, *Prosser and Keeton on Torts* § 41, at 264 (5th ed. 1984) (stating that proximate cause recognizes that "legal responsibility must be limited to those causes which are so closely connected with the result and of such significance that the law is justified in imposing liability"). The district court therefore did not err in granting summary judgment in favor of MLI.

We emphasize that our decision today does not hold that the phrase "due to" is ambiguous or that it usually translates into a proximate cause standard. On the contrary, the district court's opinion persuasively argues that "due to" is not ambiguous here because a proximate cause standard would not have been reasonable when viewing the policies as a whole. Specifically, Judge Schenkier pointed out that, unlike the causation language at issue in two Illinois cases involving accidental death and dismemberment policies, *Faulkner v. Allstate Life Insurance Co.*, 684 N.E.2d 155 (Ill. App. Ct. 1997), and *Carlson*

*v. New York Life Insurance Co.*, 222 N.E.2d 363 (Ill. App. Ct. 1966),[6] the phrase "due to" in our case not only determines the existence of coverage but also the duration of coverage under the policies. The provisions contemplate that an insured will be unable to work "due to" a sickness *or* "due to" an injury, not both. Because a disability may have more than one proximate cause, that standard would be insufficient to delineate which provision applies. Thus, Levy would face an uphill battle if it were necessary to address whether "due to" was ambiguous to begin with.

For the foregoing reasons, summary judgment in favor of the defendant is AFFIRMED.

---

[6] The causation language involved in *Faulkner* and *Carlson* differs from the language in our case. Neither party has presented Illinois authority interpreting the phrase "due to" as creating a proximate cause standard—or any other causation standard—in an insurance policy.