# In the
# United States Court of Appeals
## For the Seventh Circuit

No. 08-3994

IN RE:

ROBERT B. JAFARI and POOPAK A. JAFARI,

*Debtors.*

ROBERT B. JAFARI, POOPAK A. JAFARI and
MARK WITTMAN, Postconfirmation Trustee,

*Appellants,*

*v.*

WYNN LAS VEGAS, LLC and DESERT PALACE INC.
d/b/a CAESAR'S PALACE,

*Appellees.*

Appeal from the United States Bankruptcy Court
for the Western District of Wisconsin.
No. 06-10155-11–**Thomas S. Utschig**, *Judge*.

ARGUED APRIL 17, 2009—DECIDED JUNE 17, 2009

Before FLAUM, EVANS, and WILLIAMS, *Circuit Judges*.

FLAUM, *Circuit Judge*. Creditors Wynn Las Vegas LLC
("Wynn") and Desert Palace Inc. d/b/a Caesar's Palace

("Caesar's") filed timely proofs of claim against individual Chapter 11 debtors Robert and Amanda Jafari for gaming debts owing. Debtors objected to the proofs of claim. The bankruptcy court entered an order sustaining debtors' objections and disallowing the claims, based on its finding that Wisconsin substantive law applied to the claims and the gaming debts were unenforceable under Wisconsin law. Creditors appealed to the district court, and the district court determined that Nevada substantive law applied to the claims. The district court remanded the case to the bankruptcy court for further determination as to whether the claims were allowed under Nevada law. Upon remand, the bankruptcy court, applying Nevada law, allowed creditors' claims. This appeal followed, and we now affirm the bankruptcy court's order allowing the claims.

## I. Background

Debtor Robert Jafari, a former CEO of the Meadowbrook Manor chain of nursing homes, has a history of gambling problems. In 2003 or 2004, he borrowed roughly $3,000,000 from family friends to cover gambling losses. His father then bailed him out from those gambling debts.

Jafari continued to gamble, though. In 2005, Jafari met casino developer Steve Wynn, who personally approved a credit line at his Las Vegas, Nevada casino for Jafari. Jafari traveled from his Wisconsin residence to Las Vegas to gamble at Wynn and elsewhere on numerous occasions during 2005. As of September 2, 2005, Jafari did not owe anything to Wynn for credit extended to gamble.

On or about September 17, 2005, Jafari executed a new credit agreement with Wynn. The agreement established an initial credit line of $150,000. On September 17, September 19, and September 26, Jafari executed credit line increase requests in which he obtained increases totaling, at one point, up to $1,000,000. The initial credit agreement and the increase requests contained Nevada choice-of-law provisions.

Caesar's, based in Las Vegas, similarly extended credit, totaling $250,000, to Jafari between September 25 and September 30, 2005. Each of Caesar's markers contained Nevada choice-of-law provisions as well.

Both Wynn and Caesar's had performed credit checks on Jafari and, in exchange for the credit, prepared markers that were executed by Jafari and post-dated. Jafari did not repay the credit advance by the post-date, and the casinos submitted the markers for payment against Jafari's bank account. Both the Wynn and Caesar's markers were returned with payment denied, stamped "Refer to Maker."

When Jafari's markers were returned unpaid, Wynn and Caesar's sued Jafari in federal district court in Nevada. On February 6, 2006, two days before his deadline for filing an answer in Nevada, Jafari and his wife Amanda filed an individual Chapter 11 bankruptcy proceeding in the United States Bankruptcy Court for the Western District of Wisconsin. The bankruptcy filing stayed the Nevada lawsuit.

On August 8 and 11, 2006, Caesar's and Wynn filed timely proofs of claim in bankruptcy court for the

amounts owing. Wynn submitted a proof of claim for $1,205,178.60. Caesar's submitted a proof of claim for $250,000. The Jafaris and the bankruptcy trustee, Mark Wittman, objected to the casinos' claims, arguing that they were gambling debts unenforceable under the Wisconsin Anti-Gaming Statute.

The question whether to allow or disallow the claims was presented to the bankruptcy court. The bankruptcy court concluded that it was required to follow the choice-of-law rules of the forum state, Wisconsin, rather than federal choice-of-law rules; that a Wisconsin court would apply Wisconsin substantive law to the casinos' claims; and that the claims were not allowed because they were "unenforceable" under the Wisconsin Anti-Gaming Statute, which states:

> Gaming contracts void. (1) All promises, agreements, notes, bills, bonds, or other contracts, mortgages, conveyances or other securities, where the whole or any part of the consideration of the promise, agreement, note, bill, bond, mortgage, conveyance or other security shall be for money or other valuable thing whatsoever won or lost, laid or staked, or betted at or upon any game of any kind or under any name whatsoever, or by any means, or upon any race, fight, sport or pastime, or any wager, or for the repayment of money or other thing of value, lent or advanced at the time and for the purpose, of any game, play, bet or wager, or of being laid, staked, betted or wagered thereon shall be void.

Wis. Stat. § 895.055.

Wynn and Caesar's appealed to the United States District Court for the Western District of Wisconsin. The district court noted, as an initial matter, that much of the Jafaris' brief was devoted to policy arguments regarding the harmful nature of gambling to suggest that both equity and public policy required the court to invalidate the casinos' claims. The district court declined to so rule, stating, "[I]t is neither necessary or appropriate for this Court to venture into that tangled thicket of moral judgment and public policy." The district court then reversed the bankruptcy court. Notably, the district court declined to decide whether federal common law choice-of-law rules or Wisconsin choice-of-law rules applied. Rather, it determined that under either federal common law choice-of-law rules or Wisconsin choice-of-law rules, Nevada substantive law would apply in determining the enforceability of the contracts on which the claims were based. The court remanded the case to the bankruptcy court for further determination as to whether the claims were allowed under Nevada law. Upon remand, the bankruptcy court applied Nevada substantive law, allowed the Wynn claim in the amount of $1,310,697.03 (the amount filed plus legal fees), and allowed the Caesar's claim in the amount of $263,354.99 (the original amount claimed plus additional expenses and interest). Debtors and their trustee then brought this appeal.

## II. Analysis

We review questions of choice-of-law de novo, *Tanner v. Jupiter Realty Corp.*, 433 F.3d 913, 915 (7th Cir. 2006), and

we review the bankruptcy court's findings of fact for clear error. *In re ABC-Nako, Inc.*, 483 F.3d 470, 472 (7th Cir. 2007).

Appellants argue that in the absence of a federal policy or interest compelling a different result, when a question of state law is presented in federal court, including federal bankruptcy court, the choice of which state's law to apply should be governed by the forum state's choice-of-law rules. They seek to demonstrate that there is no federal policy or interest favoring enforcing out-of-state gambling debts in bankruptcy cases. Therefore, they argue that we should apply Wisconsin choice-of-law rules to this case. They continue that under Wisconsin choice-of-law rules, Wisconsin substantive law would apply (in part because of Wisconsin's interest in enforcing its anti-gambling public policy). They conclude that the casinos' claims are disallowed under Wisconsin law. They add that to the extent there is any confusion over whether a Wisconsin court would apply Wisconsin substantive law to the facts presented, we should certify that question to the Wisconsin Supreme Court. In connection with their appeal, appellants filed a motion for certification of question of state law.

Appellees first argue that we should conclude that the bankruptcy court must apply federal common law choice-of-law rules because such an approach leads to uniformity in administering the bankruptcy code. They state that under federal common law choice-of-law rules, Nevada substantive law would apply to this case, and their claims would be allowed under Nevada law. They con-

tinue that even if we were to conclude that the bankruptcy court must follow the forum state's choice-of-law rules, Nevada law would apply because Jafari's contacts with Nevada favor application of Nevada law. Thus, they argue that we should allow their claims whether we determine: (a) that federal common law choice-of-law rules apply in a bankruptcy case; (b) that the forum state's choice-of-law rules apply in a bankruptcy case; or (c) that we need not decide whether state or federal law supplies the choice-of-law rules in a bankruptcy case because federal and forum state choice-of-law principles would lead to the same outcome in this case.

When a federal court sits in diversity, it generally applies the choice-of-law rules of the state in which it sits. *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487 (1941). It does so to avoid intrastate forum-shopping and inconsistent results. *Id.* at 946. However, a federal bankruptcy court's jurisdiction does not arise from diversity, but from federal bankruptcy law, which has a goal of national uniformity rather than congruence with state law. Yet state law governs the validity of most property rights, and except when the bankruptcy code specifies otherwise, bankruptcy courts must apply the relevant state law. *Butner v. United States*, 440 U.S. 48, 54 (1979); *In re Wright*, 492 F.3d 829, 832 (7th Cir. 2007) ("[S]tate law determines rights and obligations when the [Bankruptcy] Code does not supply a federal rule."). Thus, there is a tension as to whether bankruptcy courts follow federal common law choice-of-law principles or the forum state's choice-of-law principles.

A review of the case law does little to resolve this tension. In contemplating which set of laws to apply to determine a creditor's claim for interest on unpaid interest, the Supreme Court once observed that:

> [O]bligations . . . often have significant contacts in many states, so that the question of which particular state's law should measure the obligation seldom lends itself to simple solution. In determining which contact is the most significant in a particular transaction, courts can seldom find a complete solution in the mechanical formulae of the conflicts of law. Determination requires the exercise of an informed judgment in the balancing of all the interests of the states with the most significant contacts in order best to accommodate the equities among the parties to the policies of those states.

*Vanston Bondholders Protective Comm. v. Green*, 329 U.S. 156, 161-62 (1946). Some have taken this passage to indicate the Court's intent to separate bankruptcy jurisdiction from diversity jurisdiction for choice-of-law purposes. *See, e.g.*, *In re SMEC, Inc.*, 160 B.R. 86, 90-91 (Bankr. M.D. Tenn. 1993); *In re Kaiser Steel Corp.*, 87 B.R. 154, 158 (Bankr. D. Colo. 1988). The Court in *Vanston* did not have to make a choice of state laws to decide the claim before it, however, and so the passage was only dicta. Since *Vanston*, the Supreme Court has not addressed whether federal choice-of-law rules or the choice-of-law rules of the forum state apply in bankruptcy, and the courts of appeals that have reached the question have been divided. *Compare In re Lindsay*, 59 F.3d 942, 948 (9th Cir.

1995) ("In federal question cases with exclusive jurisdiction in federal court, such as bankruptcy, the court should apply federal, not forum state, choice-of-law rules."), *with In re Gaston & Snow*, 243 F.3d 599, 605-06 (2d Cir. 2001) (concluding that a bankruptcy court should apply the choice of law rules of the forum state). The Seventh Circuit has not reached the question. *See In re Morris*, 30 F.3d 1578, 1582 (7th Cir. 1994) (acknowledging the difficult question of whether federal or forum choice-of-law rules apply in bankruptcy cases, but declining to resolve it because federal and forum state choice-of-law principles yielded the same result in that case); *see also Fogel v. Zell*, 221 F.3d 955, 966 (7th Cir. 2000) (referencing "persisting uncertainty as to whether state or federal law supplies the choice of law rules in a bankruptcy case.").

Appellants do not dispute that if a federal choice-of-law analysis applies to this case, Nevada substantive law would apply and—based on the bankruptcy court determination on remand—the claims would be allowed. Therefore, if we conclude that Wisconsin choice-of-law principles would produce a result consistent with the application of the federal common law approach, we need not resolve whether federal or forum state choice-of-law rules apply in bankruptcy, because our answer to that question would not matter to the outcome of this case.

To determine which jurisdiction's laws a Wisconsin court would apply to a contractual dispute such as this one, we need to look to Wisconsin contract choice-of-law

rules.[1] While the Wisconsin Supreme Court has acknowl-
edged that Wisconsin's choice-of-law jurisprudence "had
something of a checkered past," *Drinkwater v. Am. Family
Mut. Ins. Co.*, 714 N.W.2d 568, 574 (Wis. 2006), it is clear
that in contractual disputes, Wisconsin courts now apply
the "grouping of contacts" rule. *State Farm Mut. Auto. Ins.
Co. v. Gillette*, 641 N.W.2d 662, 670-671 (Wis. 2002) (quoting
*Haines v. Mid-Century Ins. Co.*, 177 N.W.2d 328, 330 (Wis.
1970)). That is, contract rights must be "determined by
the law of the [jurisdiction] with which the contract has
its most significant relationship." *Id.* (quoting *American
Std. Ins. Co. v. Cleveland*, 369 N.W.2d 168, 171 (Wis. Ct.
App. 1985)). The "first rule" in the choice-of-law analysis
is "that the law of the forum should presumptively apply
unless it becomes clear that nonforum contacts are of the
greater significance." *Drinkwater*, 714 N.W.2d at 575-76
(quoting *Gillette*, 641 N.W.2d at 676). In a close contracts
case, if it is not clear that the nonforum contacts are of
greater significance, then the court typically analyzes as
a tie-breaker the five choice-influencing factors developed
in *Heath v. Zellmer*, 151 N.W.2d 664, 672 (Wis. 1967). *See
Haines*, 177 N.W.2d at 332-33.[2] However, if it is clear that

---

[1] The district court's statement that "neither party addresses the
applicability or relevance of the choice-of-law provisions in-
cluded in the casinos' contracts" remains true on appeal.

[2] The five *Heath* factors are: (a) Predictability of results;
(b) Maintenance of interstate and international order;
(c) Simplification of the judicial task; (d) Advancement of
the forum's governmental interests; and (e) Application of the

(continued...)

the nonforum contacts are of greater significance in a contracts case, then Wisconsin courts will apply the law of the nonforum state without analyzing the *Heath* factors. Relevant contacts include: (a) the place of the contracting; (b) the place of negotiation of the contract; (c) the place of performance; (d) the location of the subject matter; and (e) the respective domiciles, places of incorporation and places of business of the parties. *Hystro Prods., Inc. v. MNP Corp.*, 18 F.3d 1384, 1387 (7th Cir. 1994); *Haines*, 177 N.W.2d at 330.

Here, there is no question that Jafari was in Nevada when he negotiated for and reached agreement on the credit lines that gave rise to the casinos' claims. The credit agreements, credit line increase requests, and markers were executed and consummated in Nevada, and they were to be performed in Nevada. Moreover, creditors' casinos do business in Nevada, and Jafari used the proceeds of his loans to gamble at the casinos. The debt was payable to Wynn and Caesar's in Nevada. In contrast, Wisconsin's only contact with the contracts was that Jafari happened to reside in Wisconsin at the time he entered into the agreements. The significant contacts in this case strongly favor Nevada, not Wisconsin. Because the nonforum contacts undoubtedly are of the greater significance, we do not need to consider the five *Heath*

---

[2] (...continued)
better rule of law. These factors play a more prominent role in tort cases and in cases in which tort and contract law are both relevant.

factors. Wisconsin courts, applying their forum's choice-of-law analysis, would apply Nevada law to govern the Wynn and Caesar's claims.

Appellants seem to argue that regardless of the result of the "grouping of contacts" test, if enforcing nonforum law would contravene Wisconsin public policy, a Wisconsin court will refuse to do so and will apply Wisconsin law instead. They continue that enforcing gambling debts is against Wisconsin's public policy. The cases that they cite in making this argument are distinguishable from the instant case, though. Most of their cases stand for the proposition that the freedom to contract for choice-of-law is qualified because parties cannot override public policies of the state whose law would apply absent the choice-of-law clause. For instance, the Wisconsin Supreme Court has stated that although parties may seek to promote "certainty and predictability in contractual relations," they will not be "permitted to do so at the expense of important public policies of a state whose law would be applicable if the parties choice of law provision were disregarded." *Bush v. Nat'l Sch. Studios, Inc.*, 407 N.W.2d 883, 886 (Wis. 1987); *see also General Med. Corp. v. Kobs*, 507 N.W.2d 381, 384 (Wis. Ct. App. 1993) ("parties cannot, by contract, override fundamental polices of the state whose law would be applicable absent the choice of law provision"). In *Drinkwater*, the court determined that the express choice-of-law provision for Iowa law contravened Wisconsin policy, and that the contract would not control if the "significant contacts" choice-of-law analysis led to a determination that, "absent the clause, Wisconsin law

would apply." *Drinkwater*, 714 N.W.2d at 574. The court then conducted its choice-of-law analysis and determined that absent the clause Wisconsin law would apply. The court therefore voided the forum selection provision as contrary to public policy. The court never suggested that if it had determined that Iowa law would have applied under a grouping of contacts analysis, it nevertheless would have applied Wisconsin law to enforce Wisconsin public policy. Indeed, we find no authority for the conclusion that a Wisconsin court that determines through a significant contacts choice-of-law analysis that the nonforum state's law should apply nevertheless will apply Wisconsin law if enforcing nonforum law would contravene Wisconsin public policy. To the contrary, Wisconsin cases clearly indicate that a Wisconsin court would apply Nevada law to the Wynn and Caesar's claims.

With regard to the request that we certify a question of state law to the Wisconsin Supreme Court, that court is only permitted to answer certified questions "as to which it appears to the certifying court there is no controlling precedent in the decisions of the supreme court and the court of appeals of [Wisconsin]." Wis. Stat. § 821.01. Certification is appropriate when the case "concerns a matter of vital public concern, where the issue will likely recur in other cases, where resolution of the question to be certified is outcome determinative of the case, and where the state supreme court has yet to have an opportunity to illuminate a clear path on the issue." *In re Badger Lines, Inc.*, 140 F.3d 691, 698-99 (7th Cir. 1998). The Wisconsin Supreme Court has illuminated

that it would apply Nevada law to the claims at issue here, so we cannot certify the question to the state high court. Moreover, we need not decide whether state or federal law supplies the choice-of-law rules in a bankruptcy case because Nevada substantive law would apply either way.

### III. Conclusion

We AFFIRM the bankruptcy court's conclusion on remand that the Wynn and Caesar's claims are allowed. We DENY appellants' motion for certification of question of state law.