In the
# United States Court of Appeals
## For the Seventh Circuit

No. 11-3687

EDWARD JEROSKI, doing business as
USA CLEANING SERVICE
AND BUILDING MAINTENANCE,

*Petitioner*,

*v.*

FEDERAL MINE SAFETY AND HEALTH
REVIEW COMMISSION and
U.S. SECRETARY OF LABOR,

*Respondents*.

Petition to Review Order of
Federal Mine Safety and Health Review Commission.

ARGUED SEPTEMBER 14, 2012—DECIDED OCTOBER 11, 2012

Before POSNER, ROVNER, and WILLIAMS, *Circuit Judges*.

POSNER, *Circuit Judge*. We are asked to reverse an administrative denial of an application for an award of attorneys' fees under the Equal Access to Justice Act, 5 U.S.C. § 504. The Act provides, so far as bears on this case, that "a prevailing party" shall be awarded "fees and

other expenses" incurred by it in an "adversary adjudication" before a federal agency unless "the position of the agency was substantially justified." § 504(a)(1). The parallel provision applicable to a judicial (as distinct from an administrative) adjudication, 28 U.S.C. § 2412(a)(1), is not involved.

The petitioner, USA Cleaning, is a proprietorship with fewer than 10 employees. (A proprietorship is not a legal entity, but merely a name under which the owner, who is the real party in interest, does business. *York Group, Inc. v. Wuxi Taihu Tractor Co.*, 632 F.3d 399, 403 (7th Cir. 2011); *Bartlett v. Heibl*, 128 F.3d 497, 500 (7th Cir. 1997); see 5 U.S.C. § 504(b)(1)(B). We have reformed the caption accordingly, but will continue to refer to USA Cleaning as the petitioner, as the parties do.) It provides janitorial services, mainly to a cement plant in Logansport, Indiana owned by Essroc Cement Corporation. But after an inspection of the plant by an inspector from the Federal Mine Safety and Health Administration, the administration ordered the three janitors whom the inspector had noticed doing cleaning work in the plant to undergo 24 hours of safety training. The mine-safety administration also issued what is called a "withdrawal order," forbidding USA Cleaning to allow these janitors to reenter the plant until they completed the training. 30 U.S.C. § 814(g)(1).

A cement plant is not a mine—cement is made, not mined—and obviously people who clean a cement plant are not "miners" in the ordinary sense of the word. But federal mine-safety regulations, the validity of which is

not challenged, define a "miner" as anyone who "works at a mine and who is engaged in mining operations," and define "mining operations" to include "maintenance and repair of mining equipment." 30 C.F.R. §§ 46.2(g)(1)(i), 46.2(h). And "mine" includes any "facilit[y] . . . used in . . . the milling of [extracted] minerals." 30 U.S.C. § 802(h)(1). The minerals from which cement is made are mined, and the mined minerals are then milled in plants such as Essroc's. The mine-safety administration was concerned that by working in the plant, and specifically in plant buildings in which cement was being milled, the janitors were being exposed to safety hazards similar to those of the workers who do the actual milling, and so were "miners." That they were not employees of Essroc, but of an independent contractor, is acknowledged to be irrelevant.

Still, to regard them as having been engaged in milling, and specifically in "maintenance and repair" of the equipment Essroc uses in milling, is a considerable stretch; and we'll assume, though without having to decide, that it's a stretch that breaks the elastic band that is an agency's interpretation of its own regulations. No matter. The petitioner must lose even if the mine-safety administration exceeded its authority in ordering the safety training of the janitors and, pending completion of that training, barring them from the plant.

When Essroc learned of the withdrawal order, it offered to provide legal assistance to USA Cleaning at no cost to the tiny company, and within a week the lawyers ran up a bill of $22,000. The lawyers initiated on

the company's behalf a proceeding before the Federal Mine Safety and Health Review Commission to vacate the order—a "contest proceeding"—on the ground that the janitors were not engaged in mining operations. A week after issuing the withdrawal order the mine-safety administration vacated it, though without acknowledging error in having issued it. The review commission followed suit by dismissing, without prejudice, USA Cleaning's contest proceeding. Though it had incurred no legal expense as a consequence of the order, USA Cleaning asked the mine-safety administration to award it the $22,000 in legal fees that Essroc had paid the lawyers to labor to get the order lifted. The administration refused, precipitating an appeal by USA Cleaning first to the review commission, which upheld the refusal, and now to us.

An initial peculiarity about the petition for review in our court (besides the misnaming of the petitioner) should be noted. Not the Federal Mine Safety and Health Administration, but a separate body, the Federal Mine Safety and Health Review Commission, is named as the respondent along with the Secretary of Labor. The review commission is the equivalent of a court. It did not issue the order challenged by the petitioner, but merely upheld the refusal of the mine-safety administration—the agency that had by issuing the order "conduct[ed] an adversary adjudication" with the petitioner—to award attorneys' fees. The administration is an agency in the Department of Labor, so the Secretary of Labor is a proper respondent—but the only proper respondent, so we dismiss the review commission.

The Secretary argues that USA Cleaning was not a "prevailing party" in the aborted agency proceeding because the mine-safety administration merely withdrew its withdrawal order—it can reissue it if it wants to. No legal right of USA Cleaning has yet been vindicated, no order entered that would establish the right of the janitors to do cleaning in Essroc's plant without 24 hours of safety training. All eight courts of appeals to have considered the meaning of "prevailing party" in the Equal Access to Justice Act would have denied that status to USA Cleaning. See, e.g., *Green Aviation Management Co. v. FAA*, 676 F.3d 200, 202-03 (D.C. Cir. 2012); *Turner v. National Transportation Safety Board*, 608 F.3d 12, 16 (D.C. Cir. 2010); *United States v. Milner*, 583 F.3d 1174, 1196-97 (9th Cir. 2009); *Aronov v. Napolitano*, 562 F.3d 84, 89 (1st Cir. 2009) (en banc); *Ma v. Chertoff*, 547 F.3d 342 (2d Cir. 2008) (per curiam); *Morillo-Cedron v. District Director for U.S. Citizenship & Immigration Services*, 452 F.3d 1254, 1257-58 (11th Cir. 2006); *Goldstein v. Moatz*, 445 F.3d 747, 751 (4th Cir. 2006); *Marshall v. Commissioner of Social Security*, 444 F.3d 837, 840 (6th Cir. 2006); *Thomas v. National Science Foundation*, 330 F.3d 486, 492 n. 1 (D.C. Cir. 2003); *Brickwood Contractors v. United States*, 288 F.3d 1371, 1379 (Fed. Cir. 2002).

But we are not one of the eight circuits; this is our first brush with the issue. And except for *Turner* and *Green Aviation*, the decisions we've just cited concern the section of the Equal Access to Justice Act that deals with judicial rather than administrative adjudication. But there is no material difference between the two sections, at least so far as relates to the meaning of "prevailing

party." And while not all the decisions involve voluntary dismissals, all hold that a "prevailing party" is a party that obtains relief which determines or affects its legal status, as would have happened in this case had the review commission, rather than dismissing the contest proceeding without prejudice, ruled that USA Cleaning's employees were not "miners" within the meaning of the mine-safety act and the regulations under it.

Yet are those decisions sound? All rely on the Supreme Court's decision in *Buckhannon Board & Care Home, Inc. v. West Virginia Dep't of Health & Human Resources*, 532 U.S. 598 (2001), a case involving not the Equal Access to Justice Act but the Fair Housing Amendments Act of 1988 and the Americans with Disabilities Act. Both of those acts provide that "the court, in its discretion, may allow the prevailing party . . . a reasonable attorney's fee." 42 U.S.C. §§ 12205, 3613(c)(2). *Buckhannon* calls "prevailing party" a "legal term of art" designating a party that obtains a judgment or other relief from a court; defines "judgment" to mean an enforceable judgment, which a dismissal without prejudice is not; finds the legislative history too inconclusive to warrant the further departure sought by Buckhannon from the "American Rule" that each party to a lawsuit bears its own litigation expenses (as distinct from England's "loser pays" rule); and points out that to allow fee shifting in cases that a court had dismissed at the government's behest, without prejudice, would discourage such dismissals and thus might actually disserve the interests of persons who get into legal tangles with the government.

The key term in the Equal Access to Justice Act is "prevailing party," and is the identical term that was the Supreme Court's focus in *Buckhannon*. Other terms in the Act differ from terms in the fee-shifting provisions of the housing and disabilities statutes, however, and USA Cleaning argues for example that the requirement imposed by the Equal Access to Justice Act but not by the statutes at issue in *Buckhannon* that a party seeking an award of fees show no "substantial justification" for the government's litigating position obviates the concern expressed in *Buckhannon* with allowing an attorneys' fee award to a plaintiff who "simply [had filed] a nonfrivolous but nonetheless potentially meritless lawsuit." 532 U.S. at 606. But the difference is minor, since those statutes confer discretionary authority to deny an award of fees even to a prevailing party. Anyway USA Cleaning was not really a plaintiff. The contest proceeding that it initiated was an appeal from the mine-safety administration's orders.

The legislative history of the Equal Access to Justice Act, however, favors the petitioner's position. The conference report on the original Act (enacted in 1980, with an expiration date of 1984) was explicit that a prevailing party can be a defendant who obtained a voluntary dismissal of the government's suit, H.R. Rep. No. 1431, 96th Cong., 2d Sess. 21 (1980), as were the House and Senate reports on reenacting the Act. H.R. Rep. No. 120, 99th Cong., 1st Sess. 13 (1985); S. Rep. No. 586, 98th Cong., 2d Sess. 10-11 (1984). But similar language appeared in the legislative history of the fee-shifting provisions at issue in *Buckhannon*, and the Court was unmoved by it. 532

U.S. at 607-08. And the legislative history of the Equal Access to Justice Act is not crystal-clear so far as relates to this case, because it does not foreclose the possibility that a voluntary dismissal must be with prejudice to entitle the defendant to prevailing-party status.

Still, one might as an original matter question the Court's reasoning in *Buckhannon* and thus not want to apply it to a different statute from the two statutes in that case. The fact that "prevailing party" is a "legal term of art" doesn't tell us whether it's also a "legislative" term of art—a term carrying a special meaning for legislators—which is all that matters. Nor is it apparent that Congress is so committed to the "American Rule" that it would deny fee shifting to anyone who was not a "prevailing party" in the Black's law dictionary sense that the Court thought made "prevailing party" a legal term of art. 532 U.S. at 603. The Court may not have been realistic about the legislative process in assuming that legislators think like judges, though on the other hand reliance on legislative history, even on committee reports as distinct from stray comments by individual legislators, can be unrealistic too. One never knows how many legislators read committee reports, or if they do whether they agree with them or just with the statutory text. Inferring collective intent is often a hazardous enterprise.

But we needn't explore these byways. The Court's approach in *Buckhannon* supports the position that eight circuits have taken with respect to the meaning of "prevailing party," and we bow to this heavy weight of authority.

For completeness we note (without having to decide the validity of) an independent ground urged by the government for finding USA Cleaning ineligible for an award of attorneys' fees. To be a prevailing party under the Equal Access to Justice Act a business must have a net worth of less than $7 million. 5 U.S.C. § 504(b)(1)(B)(ii). USA Cleaning satisfies this criterion but Essroc does not—and it is Essroc that paid the fees, doubtless because it does not welcome a broad construal of the Federal Mine Safety and Health Administration's authority to require costly training of Essroc's employees, and wants to head off the administration at the pass as it were. The real contenders in this litigation are Essroc and the mine-safety administration; USA Cleaning is like the dormouse in *Alice and Wonderland* sandwiched in between the March Hare and the Mad Hatter, or like "the baser nature [that] comes / Between the pass and fell incensèd points / Of mighty opposites" in *Hamlet* (Act V, sc. 2). It is a bit player.

Were this simply a case in which a firm that did not qualify for relief under the Equal Access to Justice Act had paid the fees of a firm that did qualify and was now claiming reimbursement from the government, the claim would fail. *Owner-Operator Independent Drivers Ass'n, Inc. v. Federal Motor Carrier Safety Administration*, 675 F.3d 1036, 1039 (7th Cir. 2012). But there is more to this case, requiring recognition that "the critical concern underlying the common precondition that the fee claimant must have incurred the expense is the need to assure that the employee would not have been deterred from pursuing the suit had the EAJA not ex-

isted." *Id*. at 1040; see also *Sullivan v. Hudson*, 490 U.S. 877, 883-84 (1989).

So were Essroc an insurance company picking up the tab for USA Cleaning's legal fees pursuant to an insurance contract, the fact that the insurance company's net worth exceeded $7 million would not be a bar. *Owner-Operator Independent Drivers Ass'n, Inc. v. Federal Motor Carrier Safety Administration*, *supra*, 675 F.3d at 1039. Not only because of the insurance premiums, whereby in effect the insured pays legal fees (more precisely the actuarial expectation of such fees, the calculation on which the premiums for liability insurance are based), but also because fee shifting lowers the cost of insurance by enabling the insurance company to recoup the cost of the insured's legal fees that the company pays. In both respects insurance increases the likelihood that small businesses will have the resources and therefore incentive to challenge unlawful agency actions. So treating insurance as a bar to reimbursement of fees under the Equal Access to Justice Act would operate as the deterrent deplored in our quotation from the *Owner-Operator* opinion.

Another example of where payment of fees by an ineligible third party would not be a bar to reimbursement under the Act is where a lawyer offering his services pro bono, or some other benefactor, picks up the tab for a small firm that cannot afford to hire a lawyer. In such a case fee shifting lowers the cost of providing pro bono legal services.

Closer to the present case is one in which the act that precipitates the unlawful agency action is the act of an employee. The employer will usually be the defendant and bear all legal costs, so reimbursement of its fees could not be justified as necessary to motivate the employee to fight the agency's action. The wrinkle in this case, however, is that the "employee"—who is actually not an employee but an independent contractor, a distinction of no significance, however, to the Equal Access to Justice Act—was the target of the agency action, rather than the principal, Essroc. USA Cleaning lacked the wherewithal to hire pricey lawyers to fight the mine-safety administration. Had Essroc, the principal, not financed the litigation, USA Cleaning would probably have been deterred from trying to resist the training and withdrawal orders.

But we give no weight to USA Cleaning's observation that it has no formal agreement to reimburse Essroc should it obtain an award of attorneys' fees. In the unlikely (unthinkable, really) event that USA Cleaning decided to pocket an award of fees that had been paid by Essroc rather than by it, how could that be thought reimbursement of attorneys' fees rather than a windfall?

We note in closing, with disapproval, USA Cleaning's denunciation, in its reply brief, of the Secretary of Labor's brief as "vitriolic." It's an excellent brief, and not in the least vitriolic. Moreover, since the merits of the administrative action that the mine-safety administration abandoned have not been determined, USA Cleaning (which is to say the lawyers hired by Essroc) is not justified

in calling the administration's withdrawn order "administrative bullying," or in claiming that the Secretary of Labor "admits to targeting a tiny, sole proprietorship by depriving it of one-third of its revenue," or that "when challenged, the Secretary positively bristles at the notion that she should have to defend her actions in any forum," or that she is trying to "change the words Congress chose to enact," or that she is guilty of "hubris," like Oedipus. The reply brief is bumptious, hyperbolic—even vitriolic—an angry Essroc speaking through Essroc's lawyers. We realize there's no love lost between mine operators and their federal regulators, but we expect the lawyers to be temperate.

The petition for review is

DENIED.