T.C. Memo. 2021-54

UNITED STATES TAX COURT

RANDY JENKINS, Petitioner v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

IRA W. GENTRY, JR., AND LYNN M. GENTRY, Petitioners v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket Nos. 27139-11, 28712-11.　　　　Filed May 10, 2021.

Randy Jenkins, pro se in docket No. 27139-11.

Ira W. Gentry, Jr., and Lynn M. Gentry, pro sese in docket No. 28712-11.

Michael W. Lloyd and Doreen Marie Susi, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

HOLMES, Judge:　In 1772 Yves-Joseph de Kerguelen-Trémarec was

commissioned by King Louis XVI to sail into the Southern Ocean in search of

[*2] Terra Australis.  He found instead a small archipelago almost three thousand miles off the southern tip of Africa, inhabited only by wildlife and battered by some of the worst weather in the world.  In English, these small patches of rock are named the Desolation Islands.  This is apt, for they are an awful place-- thousands of miles from the nearest inhabited territory, windswept, bereft of useful resources; and home only to weather researchers, scientists of the extreme, and a very large number of penguins.[1]  They are still a part of France, but so insignificant a part that the French have grouped them with several rocks collectively called "Îles Éparses de l'océan Indien" (Scattered Islands of the Indian Ocean) into a district within the French Southern and Antarctic Lands--itself one of France's overseas territories, but a territory with no civilian population at all.[2]

In April 2006 federal agents in Arizona, acting under the authority of a search warrant and looking for evidence of insider trading and money laundering discovered several license plates for the Kingdom of Kerguelen in the personal office of Ira Gentry.  They also found a Quebecois birth certificate in the name of

---

[1] Historical Section of the Foreign Office, Faulkland Islands Kerguelen 51-54 (H.M. Stationery Office 1920); see also United States v. Gentry, 455 F. Supp. 2d 1018, 1028 n.20 (D. Ariz. 2006).

[2] The World Factbook, French Southern and Antarctic Lands, Central Intelligence Agency, https://www.cia.gov/the-world-factbook/countries/french-southern-and-antarctic-lands/ (last visited May 3, 2021).

**[\*3]** Don Williams and a passport from Kerguelen.  The photo in this passport was of Mr. Gentry.  Across town, other agents were looking for Randy Jenkins.  They found him in possession of not just an ordinary Kerguelenois passport, but a Kerguelenois *diplomatic* passport, an ID card from the Kingdom of Kerguelen's Ministry of Transportation, and several more of the Kingdom's license plates.  This is all quite odd--for the Kerguelen Islands have never been a sovereign nation.  And they have certainly never been a kingdom.

If the penguins of those islands could speak, they would say:  "Something's fishy" (or perhaps "*C'est chelou*").

Let us now introduce Messrs. Gentry and Jenkins.

FINDINGS OF FACT

I.      <u>Ira Gentry</u>

Mr. Gentry is a well-educated man.  He earned a bachelor's degree in mechanical and electrical engineering from Arizona State University.  He then earned a Masters of Engineering degree and took several courses toward an MBA from the University of Cincinnati and Arizona State University.

In the 1990s Mr. Gentry owned a company called Universal Dynamics, whose primary product was a software program called Northstar.  Northstar was used in quality-assurance shaker systems.  These systems test the durability of

**[*4]** electronic components and finished products by applying ever greater force to figure out their "breaking points"--i.e. the amount of force needed to wreck them. A common durability test is dropping a product from higher and higher distances to see at what point it breaks. Such tests can cost a lot of money since they require breaking a lot of valuable products.

While some electronics can be tested by dropping, others (like car headlights) can't--they must instead be shaken. A headlight, for example, needs to withstand a substantial amount of road vibration to be useful. To test its durability, a "shaker system" simulates road vibrations. A shaker system has three parts. The first is the shaker itself, and the second is an amplifier that runs the shaker. The third is software that can program the other two parts to simulate different road conditions. The Northstar software that Universal Dynamics sold was aimed at the market for this third part. Universal Dynamics would sell Northstar to companies that would then combine the software with the shaker and the amplifier to complete a quality-assurance shaker system.

In the late 1990s there was a Nevada corporation called Macaw Capital, Inc. By the end of 1997 Macaw Capital had changed its name to UniDyn Corp. and

[*5] became publicly traded. In late 1997 a reverse merger[3] took place between UniDyn Corp. (the public corporation) and Universal Dynamics (the private corporation). UniDyn acquired many of Universal Dynamics' assets, including Northstar, in exchange for 180,000 shares of stock.

After this merger, Mr. Gentry became the president, CEO, and director of UniDyn. Universal Dynamics became the owner of more than 70% of UniDyn's outstanding stock.

## II.  Randy Jenkins

Mr. Jenkins is also well educated. He graduated from Brigham Young University and then earned a law degree in California. After that, he moved to Arizona and began a legal practice that taught him how to form overseas business entities. Life did not go smoothly and sometime in the 1990s he was disbarred.

Mr. Gentry's and Mr. Jenkins's paths eventually crossed, and the two became friends and colleagues. Mr. Jenkins set up many overseas entities related to UniDyn. He also helped implement an employee-leasing scheme that was used by UniDyn in an effort to save on (or perhaps avoid) employment tax.

---

[3] A reverse merger occurs when a private company acquires a public company. It allows the private company to become publicly traded without having to make an initial public offering. See SEC v. M & A W., Inc., 538 F.3d 1043, 1046 (9th Cir. 2008).

**[*6]** III.     <u>The Sterling Device and UniDyn's Rise</u>

After the merger of UniDyn and Universal Dynamics, Mr. Gentry was the controlling shareholder of a publicly traded corporation.  This can make raising money easier, and Mr. Gentry wanted to raise money to pursue two avenues of development.  The first was a textbook example of vertical integration.  UniDyn produced only one of the three parts needed for a quality-assurance system, the shaker software.  So Mr. Gentry set out to buy a U.K. company called Derritron-- a company that produced both shakers and amplifiers.  After it acquired Derritron, UniDyn would be on its way to being a single source for quality-assurance shaker systems.  Since UniDyn was by now a public company, this plan was disclosed in its SEC filings.[4]

The second avenue of development for UniDyn was a revolutionary product that had a chance to change the quality-assurance industry forever--the Sterling.  As Mr. Gentry described it to investors and in SEC filings, the Sterling would use infrared technology to take pictures of all the circuitry in an electronic component

---

[4] The record in these cases includes many of UniDyn's 10Qs, 10Ks, and 8Ks.  All are SEC filings.  Forms 10Q are quarterly reports.  <u>SEC v. Conaway</u>, 698 F. Supp. 2d 771, 802 (E.D. Mich. 2010).  Forms 10K are annual reports.  <u>Heit v. Weitzen</u>, 402 F.2d 909, 914 n.3 (2d Cir. 1968).  Forms 8K are occasional reports that disclose material events.  <u>SEC v. World-Wide Coin Invs., Ltd.</u>, 567 F. Supp. 724, 731 n.6 (N.D. Ga. 1983).

**[*7]** and immediately determine its lifespan with 100% accuracy. It promised to be a major advance in nondestructive testing and would save "literally billions of dollars" in the market. This breakthrough technology, Mr. Gentry stated, was all based on a thesis that he wrote during his student days. Though the vertical integration of more traditional shaker systems was a nice appetizer, the Sterling would be UniDyn's main course. If the product worked, it would bring enormous success to this small company and propel it away from penny-stock status forever.

Mr. Gentry described all this to one of the more credible witnesses, John Provazek. Mr. Provazek was a UPS employee in the late 1990s--and he was sold by Mr. Gentry's pitch; primarily by the Sterling but also by the plan of vertical integration. He was so impressed that he organized some presentations in the Seattle area to help find new investors for UniDyn. And it worked--he helped raise $470,000 from himself and 18 others. Mr. Gentry must have appreciated Mr. Provazek's efforts because in early 1998 Mr. Provazek joined the UniDyn board.[5]

Mr. Gentry and Mr. Jenkins continued to promote the Sterling to individual investors as the turn of the millennium neared. Mr. Gentry revealed to Mr. Provazek that the Sterling had been tested by IBM in England. But Mr. Provazek

---

[5] It is not clear that this appointment came with any actual responsibility. Provazek had no real power and "wasn't doing anything." He even viewed the appointment as just a position given--a "kind of a name plate."

[*8] wasn't the only audience for Mr. Gentry's touts. In 1998 UniDyn stated in its SEC filings that the company was in the process of patenting the Sterling. It also disclosed that a large Japanese company had made a firm commitment to buy at least 20 Sterling units. In 1999 Mr. Gentry told investors that the large Japanese company was TechNet, Inc., and that it had committed to buying those 20 units at $190,000 a piece--a $3.8 million contract. Then, at the very end of 1999, UniDyn disclosed that it had completed a stock acquisition of Avalon Manufacturing Co. so that it could begin manufacturing the Sterling in house.

In April 2000 momentum continued to build as Mr. Gentry wrote in a press release that UniDyn had secured a contract for 35 shaker units--a million-dollar contract and a major event for the company. Then came the biggest deal of all--a press release announced that the company had reached another agreement with TechNet, this time for $250 million of Sterling units. Mr. Gentry disclosed that the contract was signed by Hiroshi Tsuriya.[6] This was the biggest contract of all for UniDyn and it drove up the stock price like never before.

---

[6] This would not have been the first time Mr. Gentry dealt with Mr. Tsuriya. He had worked for another Japanese company called Emic which had bought the Northstar software to bundle with shakers and amplifiers to sell to the Japanese market.

**[*9]** IV.     <u>The Fall</u>

UniDyn, however, never did become the leader in its industry that it looked likely to become.

The reason is simple.

It was all a lie.

Let's start with the million-dollar shaker contract.  What the press release failed to disclose was that this contract was with Avalon--by now a subsidiary of UniDyn.  Failing to mention in a press release that an important contract was between a parent and a subsidiary is an important detail that Mr. Gentry should not have omitted.

But that was a small matter.  It also turned out that IBM had never actually tested the Sterling.  <u>United States v. Jenkins</u>, 633 F.3d 788, 795 (9th Cir. 2011).  UniDyn's disclosure in its 1998 SEC filings--that it was in the process of obtaining a patent on the Sterling--was not entirely true either, unless one counts Mr. Gentry's decision to keep the design of the Sterling "in his head" for protection as a very, very preliminary part of the patenting process.  The supposed contracts UniDyn had entered into for the Sterling?  Not ever really signed.  The 1999 disclosure that TechNet was buying 20 units for $3.8 million?  Made up.

**[*10]** But there was still the $250 million contract with TechNet. It had Mr. Tsuriya's signature, but Mr. Provazek started to investigate. He called Mr. Tsuriya. Mr. Tsuriya denied signing any contract. Mr. Provazek confronted Mr. Gentry, who said Mr. Tsuriya was the liar. Mr. Provazek concluded that, while Mr. Tsuriya's signature may well have been genuine, Mr. Gentry had cut it from whatever document he found it on and then pasted or traced it on the big contract with TechNet.

The directors of UniDyn met without Mr. Gentry and agreed after a brief investigation that Mr. Tsuriya hadn't signed the contract. They also concluded that Mr. Gentry had himself forged the signature. The board dug deeper. It found another bad fact--the thesis that Mr. Gentry had touted as his wasn't actually his. There was a thesis, but it had been written by someone else, and the real author had long since concluded that the technology wasn't commercially feasible. Id. at 794. The board even discovered that UniDyn's own engineers had reached the same conclusion in 1999. Id. at 795.

The board then put it all together: There never was a Sterling device. It was the stuff that dreams were made of.

Or maybe nightmares. The board consulted with its attorney. It then issued a press release in May 2001 to let the public know. UniDyn's stock cratered.

[*11] UniDyn's employees were laid off. The company shrank and disappeared; its legitimate shaker and Northstar products were sold to another quality-assurance company.

V.    The Fallout

A.    Stock Sales

From 1997 through the day when Mr. Gentry stepped down as CEO, UniDyn's stock price had fluctuated wildly--from around $.15 per share to above $4.75 per share.

Some investors did well in this volatile market. The Commissioner directs our attention to four corporate investors in particular:

- Marriott Investment Fund, Ltd.,[7]

- Mearns Acceptance Corp.,

- Prime Security Funding, Ltd., and

- Universal Dynamics.

Three of these companies--Marriott Investment, Mearns Acceptance and Prime Security--had stock-trading accounts at Thomson Kernaghan. Universal Dynamics had an account at Union Securities. Both Thomson Kernaghan and

---

[7] Marriott Investment was formerly Avalon Manufacturing Co., Inc. It also at times went by Marriott Acceptance. This company has nothing to do with the popular hotel chain.

[*12] Union Securities are brokerage houses in Canada. During 2000, while the UniDyn stock price was rising rapidly, these four companies sold a lot of UniDyn stock that each had acquired at much lower prices. We have the records--here's a summary:[8]

| UniDyn stock traders | Stock basis | Stock sales | Commission | Other costs | Gains |
|---|---|---|---|---|---|
| Marriott Investment | $378,497 | $2,437,260 | ($35,307) | ($310,379) | $1,713,079 |
| Mearns Acceptance | 124,414 | 485,188 | (9,710) | (65,472) | 285,592 |
| Prime Security | 511,410 | 4,939,073 | (99,085) | (71,421) | 4,257,157 |
| Universal Dynamics | 96,750 | 1,896,267 | (39,818) | (124,679) | 1,635,020 |
| Total | 1,111,071 | 9,757,788 | (183,920) | (571,951) | 7,890,846 |

B.    Criminal Investigation

This was not going to end well. All of Mr. Gentry's and Mr. Jenkins's activities piqued the interest of the federal government. And in April 2006 the Feds executed the search warrant on Mr. Gentry's office as we've already

---

[8] The Commissioner tried to introduce a summary of his own. Mr. Jenkins, through an incisive and devastating cross-examination, proved its inaccuracy, and we had to exclude it. We were, however, able to do the work ourselves from the original source documents.

**[*13]** described.  They believed the office contained documents related to their investigation for money laundering and insider trading.  They were not disappointed.  They found:

- a real-estate purchase option between the Marriott Investment signed by Mr. Jenkins for Marriott Investment as seller and Mr. Gentry as buyer;

- the Sterling thesis from May 27, 1994;

- the corporate seals for 11 companies;[9]

- license plates supposedly from the Kingdom of Kerguelen; and

- a shareholder list of Universal Dynamics.

A search of Mr. Gentry's computer also turned up items of interest such as:

- a UniDyn letter to its auditor addressing corporate activities and listing a "Frank Edmundson" as president during 1998;

- SEC filings;

- the press releases regarding Avalon Manufacturing;

- a UniDyn letter from February 2000 purporting to be an agreement of Mearns Acceptance to sell UniDyn stock that lists Mr. Jenkins as the managing director of Mearns Acceptance;

---

[9] The seals were for: Technet, Inc., River Legacy Holdings Corp., T-Global, Inc., Tripod Associates, Ltd., Panda International Enterprises, Ltd., Veni Vidi Vici, CTX Trading, Inc., Fayreford, Ltd., Prime Security, NCS Investments, Inc., and Universal Dynamics.

**[\*14]** ● a letter from Mearns Acceptance noting an agreement with another party regarding UniDyn stock;

● a letter between Prime Security and Don Williams to transfer money to a bank account in Montreal;

● minutes from a company called Istar that listed interests including Mr. Gentry, Mearns Trust, and Jentri Family Foundation; and

● an agreement between UniDyn and Mearns Acceptance to purchase Derritron Technology for shares in UniDyn.

An expert credibly determined through metadata that Mr. Gentry was the author of these documents.

The evidence proved damning. Mr. Gentry and Mr. Jenkins were arrested. The government was able to prove that both were part of a "pump-and-dump scheme."[10] See Jenkins, 633 F.3d at 795. Neither had paid tax on his gains, which led to their convictions for tax evasion. Mr. Gentry was also convicted on 32 other felony counts:

● one for conspiracy,

● three for concealment of money laundering,

● three for transactional money laundering,

---

[10] Pump-and-dump schemes feature stockholders who give out false information about a company to cause the stock's value to be pumped up. See United States v. Zolp, 479 F.3d 715, 717 n.1 (9th Cir. 2007). They then dump the shares of stock into the market while the price is high. Id.

[*15] ●      five for wire fraud,

       ●      nine for securities fraud, and

       ●      eleven for international concealment of money laundering.

Mr. Jenkins was convicted of 20 other counts:

       ●      one for conspiracy,

       ●      one for wire fraud,

       ●      two for securities fraud,

       ●      three for concealment of money laundering,

       ●      two for transactional money laundering, and

       ●      eleven for international concealment of money laundering.

The court entered judgments against both men at the end of the criminal case--nearly $9 million for Mr. Gentry's unreported capital gains and more than $500,000 for financial transactions conducted by Mr. Jenkins.

Their subsequent appeals failed, and each spent many years in prison. See id. at 809.

C.     The Commissioner and the Civil Side

Like a pod of leopard seals spying a waddle of penguins on ice, the Commissioner's revenue agents waited patiently for Mr. Jenkins to serve all his time (and Mr. Gentry to serve most of his) and then moved in for the kill. The

**[\*16]** Commissioner has the records and the judgment from the criminal case, and now takes the position that Mr. Gentry controlled the four corporations that had trading accounts with Canadian brokers--Marriott Investment, Universal Dynamics, Prime Security, and Mearns Acceptance--and realized huge gains when they dumped their UniDyn stock in 2000. He argues that these companies were merely Mr. Gentry's alter egos, which he says make Mr. Gentry himself liable for tax on the $7.8 million of gains that they realized, less a small capital loss carryover which Mr. Gentry had.[11]  Mr. Gentry and his wife filed a joint return for 2000[12] and didn't report any of these gains. He also admitted at trial to being paid $1.1 million in service income that he also didn't report on his tax return.

The Commissioner takes the position that part of Mr. Gentry's cost of producing this income was paying about $500,000 to Mr. Jenkins for his services in helping the scheme along, which included setting up various foreign corporations. Mr. Jenkins didn't file a tax return for 2000, but the Commissioner

---

[11] The amount of unreported capital gains reflected in the judgment entered after the criminal trial and the amount of unreported capital gains now asserted by the Commissioner differ by roughly $1.1 million. It doesn't bind us here because the amount of those gains wasn't necessary for the district court's decision in a criminal case. This means collateral estoppel does not apply, and the parties fully litigated the precise amounts involved in these cases.

[12] Mr. Gentry argues that he didn't actually file a joint tax return in 2000. We find that he did, since it is in the record.

[*17] argues that money flowed from the Canadian trading houses into two Monex accounts[13] and SB 1504, Ltd., a company that, he argues, was Mr. Jenkins's alter ego. The amount of funds that flowed to the two Monex accounts and SB 1504 is uncontested:

| Sources[14] | Date | Form of compensation | Amount |
|---|---|---|---|
| Randy Jenkins PC AZ Bar Foundation Trust, Account 6955 | 10/6/00 | Cashier's check to Sanderson Ford for three vehicles for SB 1504 | $124,679 |
| Randy Jenkins PC AZ Bar Foundation Trust, Account 3255 | 3/22/00 | Wire transfer/cash to Monex account | 310,379 |
| Randy Jenkins Account 3590 | 9/19/00 | Wire transfer/cash to Monex account | 71,421 |
| Total | | | 506,479 |

---

[13] Monex is a registered leveraged-transaction merchant and commodity-trading adviser. Purdy v. Commodity Futures Trading Comm'n, 968 F.2d 510, 515 (5th Cir. 1992). It has actively bought and sold leverage contracts on precious metals since 1967. It also buys and sells precious metals for individuals, both for cash and credit. Id.

[14] These are the transactions that placed money or property into accounts or businesses the Commissioner argues were controlled by Mr. Jenkins. Prior transactions placed funds from the Canadian trading houses that Mr. Gentry controlled into these "Randy Jenkins" accounts.

[*18] Mr. Jenkins doesn't dispute the amounts, but only whether the Monex accounts or SB 1504 can be attributed to him.

We tried these cases in Phoenix. Both Mr. Gentry and Mr. Jenkins were Arizona residents when the case began.[15] After concessions[16] we are left to decide:

- whether the Commissioner has proven fraud, and

- the amount of unreported income for both Mr. Gentry and Mr. Jenkins.

## OPINION

I. Fraud

Section 6501(a) generally requires that the Commissioner assert any deficiency of income tax within three years of the filing of a return. Here, the Commissioner didn't issue a notice of deficiency for tax year 2000 to either Mr. Gentry or Mr. Jenkins until 2011. This would usually leave the Commissioner marooned, but he says that he can scramble on board two different lifeboats. The

---

[15] This means that any appeal will presumptively go to the Ninth Circuit. See sec. 7482(b)(1)(A). All section references are to the Internal Revenue Code in effect for the year at issue, and all Rule references are to the Tax Court Rules of Practice and Procedure, unless we say otherwise.

[16] Most notably the Commissioner at the end of trial conceded that Mrs. Gentry wasn't liable for a fraud penalty for 2000.

[*19] first is that the three-year statute of limitations doesn't begin to run if a taxpayer fails to file a tax return. Sec. 6501(c)(3); e.g., Rapp v. Commissioner, 774 F.2d 932, 935 (9th Cir. 1985). Mr. Jenkins didn't file a return for tax year 2000. The three-year limit also doesn't apply if a taxpayer files a fraudulent return. Sec. 6501(c)(2); see also Graham v. Commissioner, 257 F. App'x 4, 5 (9th Cir. 2007), aff'g T.C. Memo. 2005-68. It is settled law that a conviction for tax evasion estops a taxpayer from contesting fraud in a later deficiency case. See DiLeo v. Commissioner, 96 T.C. 858, 885 (1991), aff'd, 959 F.2d 16 (2d Cir. 1992); Brooks v. Commissioner, 82 T.C. 413, 431 (1984), aff'd, 772 F.2d 910 (9th Cir. 1985). This means we can move on to redetermine the amounts of the deficiencies.[17]

---

[17] We do note that the Commissioner showed written supervisory approval of the fraud penalty against Mr. Gentry as required by section 6751. The Commissioner asserted only a section 6651 fraudulent failure-to-file penalty against Mr. Jenkins, so section 6751(b)(2)(A) by its plain language doesn't apply to his case. See Beam v. Commissioner, T.C. Memo. 2017-200, at *14.

[*20] II.     Amount[18]

A.     Mr. Gentry

There are two items of income that the Commissioner argues Mr. Gentry failed to report on his 2000 tax return. The first was one that Mr. Gentry himself brought up at trial. This was a little more than a million dollars for services he rendered that were related to the reverse merger. Mr. Gentry testified that he arranged to receive this money through a company called Verde di Oro in 2000, and admitted that he did not report it on his income-tax return. We will take Mr. Gentry at his word--he should have reported this income. And since he earned it for services, it is ordinary income.[19]

The more complicated issue is whether the capital gains received by Marriott Investment, Mearns Acceptance, Prime Security, and Universal Dynamics should be included in Mr. Gentry's taxable income. Taxable income includes

---

[18] Because these cases are appealable to the Ninth Circuit, the usual presumption that a notice of deficiency is correct doesn't apply unless the Commissioner first shows some evidence that links the taxpayer to the alleged income-producing activity. See Weimerskirch v. Commissioner, 596 F.2d 358, 360-62 (9th Cir. 1979), rev'g 67 T.C. 672 (1977). Mr. Gentry's and Mr. Jenkins's convictions for tax fraud related to this income are enough evidence of such a link.

[19] This ordinary income from Mr. Gentry's business triggers self-employment tax as well. See sec. 1402; see also Parker v. Commissioner, T.C. Memo. 2002-305, 2002 WL 31818019, at *1.

[*21] *all* income--no matter the source--unless specifically excluded.  See sec. 61.

This includes income that is paid directly to a taxpayer and income that a taxpayer

receives indirectly--for example, through nominees or alter egos or sham entities.

See, e.g., Foxworthy, Inc. v. Commissioner, T.C. Memo. 2009-203, 2009 WL

2877850, at *20, aff'd, 494 F. App'x 964 (11th Cir. 2012); K&M La Botica

Pharmacy, Inc. v. Commissioner, T.C. Memo. 2006-214, 2006 WL 2848126,

at *2-*3, supplementing T.C. Memo. 2005-277; Zand v. Commissioner, T.C.

Memo. 1996-19, 1996 WL 23266, at *77 (interest to a "mere skeleton" of a

corporation is attributed to its sole shareholder), aff'd, 143 F.3d 1393 (11th Cir.

1998).

The notion that we look beyond nominal ownership to economic reality

when we try to figure out whose property the Commissioner can take to pay tax, or

who owes tax on income received in another's name, is an old one.  It is usually

the case that in gauging who has to recognize income we use doctrines like sham

partnership or sham corporation, or the proscription against assignment of income;

and in gauging whether the Commissioner can collect tax by taking property we

apply concepts like ownership by nominee or alter ego.

That creates a difficulty for the Commissioner here and perhaps

inadvertently flooded these cases with great complexity.  Here's the problem:  The

**[\*22]** Commissioner does not argue that any of these four corporations are shams. There are such things as corporations that the Code treats as "tax nothings"-- corporations with no valid business purpose. See Moline Props., Inc. v. Commissioner, 319 U.S. 436, 439 (1943); Shaw Constr. Co. v. Commissioner, 323 F.2d 316, 319-20 (9th Cir. 1963), aff'g 35 T.C. 1102 (1961). If we treat a corporation as a sham under the Code, we treat its property and income as belonging to its owner. See Moline Props., 319 U.S. at 439.

There's something similar that goes on with taxpayers who stumble into accusations of assigning their income. We don't let attempted assignments change who has to pay tax either. Lucas v. Earl, 281 U.S. 111, 114-15 (1930); Trousdale v. Commissioner, 16 T.C. 1056, 1065 (1951), aff'd, 219 F.2d 563 (9th Cir. 1955). And we ignore such attempted assignments as a matter of federal tax law.

But that's not what the Commissioner argues here. He argues instead that these four corporations were Mr. Gentry's nominees or alter egos. Arguing that these corporations were Mr. Gentry's nominees won't work here. Federal courts, though they apply these concepts, use state law to define who or what is a nominee of another. And the law that we look to is the law of the jurisdiction where the property at issue is located. In these cases, the law is settled--we apply the law of the state where the property whose ownership is at issue is located. See, e.g.,

**[*23]** <u>Hinerfeld v. Commissioner</u>, T.C. Memo. 2019-47, at *27-*28; <u>Criner v. Commissioner</u>, T.C. Memo. 2003-328, 86 T.C.M. (CCH) 655, 660 (2003).

Remember, however, that the stock sales whose gains the Commissioner wants us to include in Mr. Gentry's income were made by two corporations incorporated in the Bahamas, one in Belize, and one in Arizona. And these corporations were trading UniDyn stock through a Canadian brokerage house. The Commissioner cites a single case in which a District Court in Arizona had to decide whether a trust was the alter ego of a taxpayer. <u>See</u> <u>United States v. Landsberger</u>, CIV 94-0883-PHX-SMM, 1997 U.S. Dist. LEXIS 16113 (D. Ariz. 1997), <u>aff'd</u>, 172 F.3d 60 (9th Cir. 1999). The Commissioner asserts that this one case is enough to give us the rules for nominee ownership that we should apply here, but we can't possibly use it that way. There is not enough in the record of these cases to tell us where the stock itself was located: Toronto, where the corporations had their brokerage accounts; the three different jurisdictions where those corporations were incorporated; Arizona, where the corporations (presumably through Mr. Gentry) decided to buy and sell the stock; or where the shares (if this were even true) were located in physical form.[20]

---

[20] Stocks' physical presence has faded over time. Although companies still issue stock certificates, title and possession have been unnecessary for their

(continued...)

**[\*24]** That leaves the Commissioner to argue that these corporations were Mr. Gentry's alter egos. Mr. Gentry disputes this. Neither party was much help in arguing precisely what law defines whether a corporation is a taxpayer's alter ego.

### 1. Federal or State Law

Whether a corporation is a taxpayer's alter ego is a question of fact. See, e.g., J. Vallery Elec., Inc. v. NLRB, 337 F.3d 446, 451 (5th Cir. 2003); Duggan v. Hobbs, 99 F.3d 307, 313 (9th Cir. 1996). But different jurisdictions have different standards or tests to decide that question. Sometimes these differences can be substantial. Old W. Annuity & Life Ins. Co. v. Apollo Grp., 605 F.3d 856, 860 n.3 (11th Cir. 2010); see also, e.g., NetJets Aviation, Inc. v. LHC Commc'ns, LLC, 537 F.3d 168, 177-78 (2d Cir. 2008) (contrasting New York and Delaware law). The parties here seem to have assumed that Arizona law would apply. But there are some problems. Messrs. Gentry and Jenkins didn't give us any citable sources.

---

[20](...continued)
ownership for well over a century. Today, the majority of those certificates are held by the Depository Trust Company in New York, and are traded by its members around the world without ever leaving its vaults. See Calloway v. Commissioner, 135 T.C. 26, 56-57 (2010) (Holmes, J., concurring), aff'd, 691 F.3d 1315 (11th Cir. 2012). We have no evidence on which to base a finding about where these shares of stock were for the purpose of deciding what jurisdiction's nominee law to apply. And nominee law is usually something we use to decide whether particular property was a taxpayer's at a particular time. Here the Commissioner asks us to use it to decide whether gains on sales made at many different times belonged to Mr. Gentry.

[*25] And we are certain that the one case the Commissioner pointed us to--Landsberger again–is inapposite. In Landsberger, the court had to figure out whether a trust was the alter ego of the taxpayer. The Landsberger court did not notice the choice-of-law problem that was lurking, and created a five-factor test that it derived from three cases: F.P.P. Enters. v. United States, 830 F.2d 114, 116 (8th Cir. 1987); Shades Ridge Holding Co. v. United States, 888 F.2d 725, 729 (11th Cir. 1989); and Valley Fin., Inc. v. United States, 629 F.2d 162, 172 (D.C. Cir. 1980). See Landsberger, 1997 U.S. Dist. LEXIS 16113, at *15. These are not Arizona state cases, and they do not apply Arizona law.

F.P.P. Enterprises applied Nebraska law. 830 F.2d at 117. Shades Ridge Holding appears to limit its analysis to nominee law, not alter-ego law. 888 F.2d at 729. The court there also avoided any analysis of whether federal or state law applied because "the standards are so similar that the distinction [was] of little moment." Id. at 728. And the state law involved was Alabama state law. See Shades Ridge, 1987 U.S. Dist. LEXIS 15064, at *40.

Valley Finance also makes no mention of any state law. And the District Court in that case appeared to rely on a smattering of alter-ego law from across the country. See Pac. Dev. Inc. v. United States, No. 77-0690, 1979 WL 1283, at *4 (D.D.C. Jan. 3, 1979) (using an alter ego test derived from Supreme Court, Tenth

**[*26]** Circuit, Ninth Circuit, Fourth Circuit, D.C. Circuit, West Virginia, D.C. Court of Appeals, and the Western District of Oklahoma).

This is less than satisfactory: Before we can decide whether these four corporations were Mr. Gentry's alter egos, we logically must decide what alter-ego standard to use. This makes us like penguins. As graceful and sleek as they may be when swimming, penguins become awkward when they climb onto rocky land. But to get to decisions in these cases, we ourselves must leave the comfortable ocean of tax and scramble to the stony ground of a poorly charted and rarely visited corner of the law.

The first obstacle we meet is whether to apply federal or state law. When a federal court exercises diversity jurisdiction, it applies the law of the forum. See, e.g., Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 496 (1941); Alaska Rent-A-Car, Inc. v. Avis Budget Grp., Inc., 738 F.3d 960, 973-74 (9th Cir. 2013). But our jurisdiction in deficiency cases is a form of federal-question jurisdiction, see sec. 6214; Butler v. Commissioner, 65 T.C. 327, 331 (1975), and only a sliver of federal-question jurisdiction at that, see sec. 6330(d)(1); Vigon v. Commissioner, 149 T.C. 97, 104 (2017). So which law do we use--must we follow state law because corporations are generally creatures of state law or do we try to find federal law?

**[\*27]** Mr. Gentry's claim is that he didn't have to include income from the corporations' stock sales on his *federal* tax return required by *federal* law.  Our jurisdiction to judge this claim comes from a federal statute, so we must first look to federal law to see if it gives us an "alter ego standard."  See, e.g., O'Melveny & Myers v. FDIC, 512 U.S. 79, 85 (1994); A.I. Trade Fin., Inc. v. Petra Int'l Banking Corp., 62 F.3d 1454, 1463 (D.C. Cir. 1995) ("[A] federal court applies state law when it decides an issue *not addressed by federal law.*"  (Emphasis added.)).

That doesn't help much--there is no federal statute or regulation that defines when a corporation is a taxpayer's alter ego under the Code.  But that is not the same as saying that federal law doesn't apply.  See Trout v. Commissioner, 131 T.C. 239, 251 (2008).  Every first-year law student knows "there is no federal *general* common law."  Erie R.R. Co. v. Tompkins, 304 U.S. 64, 78 (1938) (emphasis added); see also Rodriguez v. FDIC, 589 U.S. __, __, 140 S. Ct. 713, 716 (2020).  See generally Henry J. Friendly, "In Praise of Erie--And of the New Federal Common Law," 39 N.Y.U. L. Rev. 383 (1964).  There is even some presumption that matters unaddressed by federal statute or regulation are subject to state law.  See O'Melveny & Myers, 512 U.S. at 85.  Yet sometimes Congress explicitly or implicitly authorizes the growth of federal common law in specific areas.  Id. at 87 ("Cases in which judicial creation of a special federal rule would

**[\*28]** be justified are few and restricted, limited to situations where there is a significant conflict between some federal policy or interest and the use of state law" (cleaned up)).

This usually means that one can find federal common law only in very narrow areas where applying state law would significantly conflict with federal legislation and frustrate its specific objectives. See Boyle v. United Techs. Corp., 487 U.S. 500, 507-08 (1988); United States v. Kimbell Foods, Inc., 440 U.S. 715, 739-40 (1979); Helfrich v. Blue Cross & Blue Shield Ass'n, 804 F.3d 1090, 1096 (10th Cir. 2015). One may discover it, for example, when Congress implements a nationwide program that should be uniformly administered. See Kimbell Foods, 440 U.S. at 726-28; Robinette v. Commissioner, 439 F.3d 455, 462 (8th Cir. 2006), rev'g 123 T.C. 85 (2004); Trout, 131 T.C. at 248-51.

An example familiar to tax lawyers is the construction of an "offer-in-compromise" (OIC), a way for a taxpayer to settle tax debt with the IRS. See Trout, 131 T.C. at 248-51. OICs are contracts between the federal government and a taxpayer. In Trout we had to figure out whether to resolve disputes about their terms by using the federal common law of contracts or, for example, the law of the state where a taxpayer lived. Id. at 251. We noticed three facts:

**[\*29]** ● the litigation was between an agency of the federal government and a taxpayer,

● OICs are a creation of federal law--i.e., several provisions in the Code and regulations, and

● OICs are a part of a single national program that would make figuring out what state law to apply and then applying it an "administrative nightmare."

Id. Each factor pointed us to federal common law.

Is there a federal common law of corporations as alter egos of taxpayers? Alter-ego doctrine is an exception to the general rule that courts should respect the corporate form, see, e.g., Towe Antique Ford Found. v. IRS, 999 F.2d 1387, 1391 (9th Cir. 1993), and we need to "look closely at the purpose of the federal statute to determine whether the statute places importance on the corporate form," Town of Brookline v. Gorsuch, 667 F.2d 215, 221 (1st Cir. 1981). Since corporate form is traditionally a creature of state law, see Rodriguez, 589 U.S. at __, 140 S. Ct. at 718, the "federal interest in supplanting 'important and carefully evolved state arrangements designed to serve multiple purposes'" must be great, Kimbell Foods, 440 U.S. at 729-30 (quoting United States v. Yazell, 382 U.S. 341, 353 (1966)).

Other federal courts that exercise federal-question jurisdiction look to *state* law to figure out whether a corporation is the alter ego of its owner. Most importantly for these cases, the Ninth Circuit--to which they are appealable--also

**[*30]** appears to look to forum-state law for an alter-ego standard in similar cases. See, e.g., Schwarzkopf v. Briones (In re Schwarzkopf), 626 F.3d 1032, 1037-38 (9th Cir. 2010) (bankruptcy); Towe Antique, 999 F.2d at 1391 (priority lien). Many of the other circuits seem to agree. See, e.g., United States v. Scherping, 187 F.3d 796, 801-02 (8th Cir. 1999); Floyd v. IRS, 151 F.3d 1295, 1298-99 (10th Cir. 1998); Zahra Spiritual Tr. v. United States, 910 F.2d 240, 242 (5th Cir. 1990).

There are exceptions--ERISA benefits being the most notable. See United Elec., Radio & Mach. Workers of Am. v. 163 Pleasant St. Corp., 960 F.2d 1080, 1092 (1st Cir. 1992) (applying federal common law); Lumpkin v. Envirodyne Indus., Inc., 933 F.2d 449, 460-61 (7th Cir. 1991) (same); Blair v. Infineon Techs. AG, 720 F. Supp. 2d 462, 470 n.11 (D. Del. 2010) (same). This makes sense. ERISA is a nationwide program created by federal statute. See 29 U.S.C. secs. 1301-1461 (2018). It has an explicit policy goal of ensuring that employees receive their anticipated benefits. See Alman v. Danin, 801 F.2d 1, 3-4 (1st Cir. 1986). ERISA allows beneficiaries to sue for benefits due to them, see 29 U.S.C. sec. 1132(d)(1) (2018); Lumpkin, 933 F.2d at 454-55, and this purpose might be frustrated if state law could arm defendants who deprive their employees of federally guaranteed benefits with state-law corporate shields, Lumpkin, 933 F.2d at 454-55.

**[\*31]** There also may be something similar emerging from Superfund law, where there is a federal statute that assigns liability for the cost of cleaning up hazardous waste. The Comprehensive Environmental Response, Compensation, and Liability Act of 1980 (CERCLA), Pub. L. No. 96-510, 94 Stat. 2767, imposes liability on "owners" and "operators". Article III courts have often had to figure out whether a corporate parent of a subsidiary corporation that owned or operated a pollution-riddled site is liable. There have been divergent results, with some courts trying to develop a common federal definition for when a shareholding parent should be liable, and some applying one state's law or another's. See Jennifer S. Martin, "Consistency in Judicial Interpretation? A Look at CERCLA Parent Company and Shareholder Liability After United States v. Bestfoods," 17 Ga. St. U. L. Rev. 409, 415 nn. 27-30 (2000) (collecting cases).

But circumstances like ERISA and CERCLA--where supplanting state corporate law is or may be necessary--are "few and far between." Rodriguez, 589 U.S. at __, 140 S. Ct. at 716. In the situation we have here--where we have to decide whether a corporation's capital-gain income is taxable to an individual because the corporation is his mere alter ego--we can find no express or implied congressional directive to develop a uniform federal standard. There is no regulation that tells us to do so. And we hold that it is not enough that we are

[*32] determining a taxpayer's *federal* tax liability--we would need clearer evidence of a congressional directive or stronger federal interest.[21] See Trout, 131 T.C. at 250-51.

But we then stumble into the next problem: Which state law?

### 2. Choice of State Law

Though we hold that we must look outside federal law for an alter-ego test, there are several possible candidates, and some are not just states but foreign countries. We tried these cases in Arizona and Mr. Gentry was a resident of Arizona when trial began. But two of the corporations were organized in the Bahamas, one in Belize, and only one in Arizona. And then there is the undisputed fact that the corporate accounts were with brokerage houses in Canada. It would be at least plausible to conclude that we should look to the alter-ego rules of the places of incorporation, the place of trial, the place where the brokerage

---

[21] We note that this result isn't that odd--we frequently look to state law to decide a variety of federal tax issues. See generally TFT Galveston Portfolio, Ltd. v. Commissioner, 144 T.C. 96 (2015) (rejecting federal common law for Texas law in collection of employment taxes); Estate of Little v. Commissioner, 87 T.C. 599, 601 (1986) (state law of trustee powers); Kean v. Commissioner, T.C. Memo. 2003-163, 2003 WL 21278331, at *5-*6 (state law to determine character of payment as alimony), supplemented by T.C. Memo. 2003-275, aff'd, 407 F.3d 186 (3d Cir. 2010); Conell v. Commissioner, T.C. Memo. 1993-638, 1993 WL 540769, at *3 (state law to determine if taxpayer transferee); Brotzler v. Commissioner, T.C. 1982-615, 1982 Tax Ct. Memo LEXIS 129, at *7 (state law to determine delivery date of gift).

**[*33]** accounts were located, or the residence of Mr. Gentry. And here we come to another obstacle--the rules for picking what rule to apply also differ from one jurisdiction to another. Compare Flemma v. Halliburton Energy Servs., Inc., 303 P.3d 814, 819 (N.M. 2013) ("New Mexico follows the Restatement (First) of Conflict of Laws when analyzing choice of law issues [for contracts]") with Johnson v. U.S. Fid. and Guar. Co., 696 N.W.2d 431, 441 (Neb. 2005) ("For the resolution of contract conflicts, this court has adopted the Restatement [(Second) of Conflict]").

When a federal court sits in diversity, it is well settled that it must use the forum's choice-of-law rules. See, e.g., Klaxon Co., 313 U.S. at 496; Harris v. Polskie Linie Lotnicze, 820 F.2d 1000, 1002 (9th Cir. 1987). But our jurisdiction comes from the Code, and on this point, see sec. 6214, we have a knowledgeable guide: The Ninth Circuit has held that "[i]n federal question cases with exclusive jurisdiction in federal court, such as bankruptcy, the court should apply federal, not forum state, choice of law rules."[22] See In re Lindsay, 59 F.3d 942, 948 (9th

_____

[22] Whether federal courts sitting in federal-question jurisdiction must use the forum's choice-of-law rules is a complex question--and one that not all circuits agree on. Compare Harris v. Polskie Linie Lotnicze, 820 F.2d 1000, 1003 (9th Cir. 1987), and Lindsay v. Beneficial Reinsurance Co. (In re Lindsay), 59 F.3d 942, 948 (9th Cir. 1995) with Oveissi v. Islamic Republic of Iran, 573 F.3d 835, 841 (D.C. Cir. 2009) (using the forum's choice of law rules even though the
(continued...)

**[\*34]** Cir. 1995).  And in <u>Harris</u>, the Ninth Circuit held that the federal choice-of-law rules that trial courts should apply is the Restatement (Second) of Conflict of Laws (1971) (Restatement).  <u>See</u> <u>Harris</u>, 820 F.2d at 1003.

That's what we'll do here.

To fully understand and to correctly apply the Second Restatement's rules, one needs a brief history lesson.  Before the Second Restatement, there was a Restatement (First) of Conflict of Laws (1934).  Though the First Restatement provided clear rules, their consistent application often forced courts to results that seemed unjust.  <u>See, e.g.</u>, <u>Senne v. Kan. City Royals Baseball Corp.</u>, 934 F.3d 918, 954 (9th Cir. 2019) (Ikuta, J., dissenting); <u>Bi-Rite Enters., Inc. v. Bruce Miner Co., Inc.</u>, 757 F.2d 440, 442 (1st Cir. 1985); <u>Ferrell v. Allstate Ins. Co.</u>, 188 P.3d 1156, 1172 (N.M. 2008) ("[T]he Restatement (First) has been widely criticized as being inflexible, rigid, and leading to unjust results").  One sees this negative view of

---

[22](...continued)
federal district court had federal-question jurisdiction).  It is made even more complex for the Tax Court because we have national jurisdiction--any person anywhere in the country can choose to have his or her case tried in nearly any state.  This same tension is highlighted in a bankruptcy case, <u>see</u> <u>Jafari v. Wynn Las Vegas, LLC (In re Jafari)</u>, 569 F.3d 644, 648-49 (7th Cir. 2009), which like us has national jurisdiction.  Because of the Ninth Circuit's holding in <u>Harris</u> and <u>Lindsay</u>, we need not dive into the complex but interesting topic, but we do plant a flag here to suggest that the connection between the place of trial in bankruptcy and Tax Court and what choice-of-law mavens identify as "forum state interests" may be quite attenuated.

**[\*35]** clear rules in the frequent use by advocates of the Second Restatement of adjectives like "inflexible" and "rigid".  See, e.g., Phillips v. Gen. Motors Corp., 995 P.2d 1002, 1006-07 (Mont. 2000); Second Restatement, sec. 7.  The Second Restatement allows courts to be more flexible in choosing which law should apply.  Senne, 934 F.3d at 954 (Ikuta, J., dissenting); Hoffman v. Merrell Dow Pharms., Inc. (In re Bendectin Litig.), 857 F.2d 290, 304 (6th Cir. 1988); Hardaway Constructors, Inc. v. Conesco Indus., Ltd., 583 F. Supp. 617, 622 (D.N.J. 1983) (stating the Second Restatement provides "great flexibility in deciding choice-of-law-questions").

"Flexibility" seems to be a term of praise in this field, but there are bounds even here.  Many courts have identified section 307 of the Second Restatement as stating the proper rule:

> The local law of the state of incorporation will be applied to determine the existence and extent of a shareholder's liability to the corporation for assessments or contributions and to its creditors for corporate debts.

See, e.g., Kalb, Voorhis & Co. v. Am. Fin. Corp., 8 F.3d 130, 132-33 (2d Cir. 1993); Boeing Co. v. KB Yuzhnoye, No. CV 13-00730 ABC (AJWx), 2014 WL 12601330, at \*1 (C.D. Cal. 2014); Canal Ins. Co. v. Montello, Inc., 822 F. Supp. 2d 1177, 1184 (N.D. Okla. 2011); SEC v. Levine, 671 F. Supp. 2d 14, 33 (D.D.C. 2009).

**[*36]** If this is the right rule, it'd be pretty easy to know which law to apply--we'd look to Bahamian law for Mearns Acceptance and Marriott Investment, Belizean law for Prime Security, and Arizonan law for Universal Dynamics. But then there would be a major problem for the Commissioner--we have nothing in the briefs about the alter-ego law of any of these non-Arizona jurisdictions, and any party that "intends to raise an issue concerning the law of a foreign country *shall give notice* in the pleadings or other reasonable written notice." Rule 146 (emphasis added).

There is, however, also a line of cases that holds section 307 is not the relevant rule for cases like the ones before us. Consider, for example, First Nat'l City Bank v. Banco Para El Comercio Exterior de Cuba (Bancec), 462 U.S. 611 (1983). The question was whether Bancec was an instrumentality of the Cuban government. Cuban law said no, but the Supreme Court distinguished two situations:

> As a general matter, the law of the state of incorporation normally determines issues relating to the *internal* affairs of a corporation. Application of that body of law achieves the need for certainty and predictability of result while generally protecting the justified expectations of parties with interests in the corporation * * * . Different conflicts principles apply, however, where the rights of third parties *external* to the corporation are at issue.

Id. at 621 (emphasis added).

**[*37]** The limitation in <u>Bancec</u> on the exclusive use of the law of the jurisdiction of incorporation when rights of third parties are at issue is sensible for two reasons in the cases before us. We agree first with the courts and commentators who have pointed out that section 307 of the Second Restatement refers specifically to a *shareholder's* liability for *corporate* debts. They read this rule as limited to obligations that a party owes another by virtue of his status as a shareholder, not as someone who incurred liability to another through his use of the corporation as his alter ego. <u>See, e.g.</u>, <u>Chrysler Corp. v. Ford Motor Co.</u>, 972 F. Supp. 1097, 1101-02 (E.D. Mich. 1997); <u>Itel Containers Int'l Corp. v. Atlanttrafik Express Serv., Ltd.</u>, 86 Civ. 1313 (RLC), 1988 U.S. Dist. LEXIS 7051, at *12-*14 (S.D.N.Y. July 13, 1988).

It is true that Mr. Gentry was the shareholder of the four corporations here. But the possible characterization of the capital gains those corporations received as taxable to him do not depend on his status as a shareholder, but on the possible characterization of those corporations as his alter egos. One doesn't need to be a shareholder in a corporation to treat it as an alter ego, one needs to use it as if it were one's own property without respecting its separate personality. <u>See, e.g.</u>, <u>Establissement Tomis v. Shearson Hayden Stone, Inc.</u>, 459 F. Supp. 1355, 1366

**[\*38]** n.13 (S.D.N.Y. 1978) (corporation might be nonowner-husband's alter ego, although wife owned all stock).

We also think it important that the reason the Commissioner wants us to find that the corporations were Mr. Gentry's alter egos is *not* to collect debts that the corporations owed (the specific situation defined by Second Restatement section 307), but to treat acquisitions and dispositions of UniDyn stock by those corporations as acquisitions and dispositions by Mr. Gentry himself.

Because the rights of a third party are involved, and because the characterization of the corporations as Mr. Gentry's alter egos does not depend on his status as a shareholder, we hold that section 307 of the Second Restatement is not the relevant section to apply here. See TAC-Critical Sys., Inc. v. Integrated Facility Sys., Inc., No. 09-1512 (JEB), 2011 WL 13267050, at \*3 (D.D.C. Sept. 2, 2011); Gregory S. Crespi, "Choice of Law in Veil-Piercing Litigation: Why Courts Should Discard the Internal Affairs Rule and Embrace General Choice-of-Law Principles," 64 N.Y.U. Ann. Surv. Am. L. 85 (2008).

Questions about whether a corporation is a person's alter ego are typically penguin-holed as questions about "piercing the corporate veil." But whether we surgically poke that veil to ascribe the stock sales to Mr. Gentry or, as the Commissioner advocates, tear it asunder and altogether cast it aside, we need to

**[*39]** look at cases where the corporate form is used to shelter those who control it from claims of creditors external to it.

The Second Restatement directs us to section 6--which lists general principles. Section 6(2) requires that we look at:

- the needs of the interstate and international systems;

- the relevant policies of the forum;

- the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue;

- the protection of justified expectations;

- the basic policies underlying the particular field of law;

- certainty, predictability, and uniformity of result; and

- ease in the determination and application of the law to be applied.

A court is supposed to apply these principles to determine which state has the "most significant relationship," and then use that state's law. See Second Restatement, sec. 6(2) cmt. c.

There is some nonzero probability of question begging here, as there is whenever a list of factors includes expectations and predictability of results, but it's the framework we have to build within. Even were we to start with a presumption that we apply Bahamian corporate law for Marriott Investment and

**[\*40]** Mearns Acceptance, Belizean law for Prime Security, and Arizona law for Universal Dynamics, almost all of the general principles in section 6 of the Restatement point to Arizona as the state with the "most significant relationship."

The first reason is that most states have adopted a policy that their own law should apply when third parties are affected by those using corporations as their alter egos. See Daniel R.H. Mendelsohn & Carmen Fonda, "Risky Business: What You Didn't Know About Veil Piercing of Wholly Owned Subsidiaries," Bus. L. Today (Mar. 13, 2018), https://businesslawtoday.org/2018/03/ risky-business-what-you-didnt-know-about-veil-piercing-of-wholly-owned-subsidiaries/. This includes Arizona. See U.S. Bank Nat'l Ass'n v. Starr Pass Resort Devs. LLC, No. 2 CA-CV 2018-0330, 2019 WL 2237471, at \*14-\*16, \*14 n.17 (Ariz. Ct. App. May 22, 2019). This makes some sense--alter-ego doctrine protects those outside the corporation, and if most state courts have come around to the view that they will apply their own alter-ego law in their own courts, it also means that adoption of Arizona law here would "further the needs of the interstate and international systems and likewise the values of certainty, predictability and uniformity of result." See Second Restatement, sec. 6(2) cmt. d.[23]

---

[23] One notes that the increasing prevalence of this newer rule may show less a move from "rigidity" and "inflexibility" to "flexibility" than simply a move from

(continued...)

**[\*41]** There is also some strength in the "relationship" analysis that the Second Restatement urges us to engage in. Arizona's interest here is presumably to regulate in a sensible and uniform way those whose conduct in Arizona affects corporate creditors in Arizona. Any tax debt owed to the Commissioner arose from acts Mr. Gentry committed in Arizona, and it might seem odd for his liability for these acts to be judged differently because his corporations were organized under the laws of different jurisdictions. Mr. Gentry is also domiciled in Arizona. Arizona has an interest in whether its residents should be subject to potential liability via the alter-ego doctrine.

The Bahamas and Belize in contrast have almost no connection to these cases, other than three of these corporations' being incorporated there. None of these corporations has any employees or conducts any business in the Caribbean. They exist there only on paper.

And the Second Restatement's list is open-ended. Second Restatement, sec. 6(2) cmt. c. That lets us consider one very important factor that is not on the list-- the incorporation of these companies abroad was an attempt to illegally avoid

---

[23](...continued)
an old rule to a new rule. Perhaps even a new rule that reflects the change, in the decades since the First Restatement's publication, to newer and easier methods of incorporation in jurisdictions that have no connection whatsoever to where a corporation is active.

[*42] taxes and led to Mr. Gentry's conviction for tax evasion (and 32 other felonies). Incorporating these companies abroad to further tax evasion is, we think, an additional factor that weighs in favor of applying Arizona law--as we wouldn't think it likely that a non-Arizona jurisdiction's interest in letting its corporate law be used to create instrumentalities of crime is one we should give much weight to. See Second Restatement, sec. 10.

We therefore hold that, on the facts of these cases, Arizona has the most significant relationship with these cases, and its law should be used to determine whether each of these corporations was an alter ego of Mr. Gentry.

### 3. Arizona Law of Corporate Alter Egos

Having decided to apply the Arizona law of corporate alter egos, we now have to figure out what that law is. That law seems to be one without very bright lines, and is more of an open-ended facts-and-circumstances test. See Emp'r's Liab. Assurance Corp., Ltd. v. Lunt, 313 P.2d 393, 395-96 (Ariz. 1957); Keg Rests. Ariz., Inc. v. Jones, 375 P.3d 1173, 1182 (Ariz. Ct. App. 2016). Arizona courts look to see--again in what seems to a tyro analyst of such questions a question-begging way-- if "there is such a unity of interest and ownership that the separate personalities of the corporation and the owners cease to exist." Ize Nantan Bagowa, Ltd. v. Scalia, 577 P.2d 725, 728 (Ariz. Ct. App. 1978). We are

**[*43]** told more helpfully to check to see whether the owner exercises "substantially total control" over the corporation in question. See Specialty Cos. Grp. LLC v. Meritage Homes of Ariz., Inc, 461 P.3d 454, 459 (Ariz. Ct. App. 2020) (quoting Taeger v. Catholic Family & Cmty. Servs., 995 P.2d 721, 733-34 (Ariz. Ct. App. 1999)). And still more helpfully, Arizona courts have identified the purpose of alter-ego doctrine as the prevention of "'fraud,' 'misuse,' and 'injustice' arising from misuse of the corporate form of organization." Butler Law Firm, PLC v. Higgins, 410 P.3d 1223, 1229 (Ariz. 2018).

With this, we arrive on solid ground.

## I.     Marriott Investment

Marriott Investment was formerly Avalon Manufacturing--the company that UniDyn bought to pretend to make the Sterling. By 2000 Avalon had changed its name to Marriott Investment. This company cannot be separated from Mr. Gentry. He controlled its voting shares. He opened the corporation's account at Thomson Kernaghan through his alias Don Williams. Funds from this account went to other accounts controlled by Mr. Gentry for no consideration. Mr. Gentry then took those funds for his personal use, such as to buy a $9,100 Rolex watch. And, most importantly, he used this corporation to commit tax evasion and a host of other crimes, a use Arizona says alter ego doctrine is specifically meant to stop. See id.

**[\*44]** We, therefore find it more likely than not that Marriott Investment was Mr. Gentry's alter ego.

### ii.    Mearns Acceptance

Mearns Acceptance was a large shareholder of UniDyn.  But despite this large ownership interest, other UniDyn board members weren't even aware it held this interest.  When asked about Mearns Acceptance, Mr. Gentry would dismiss the inquiry and say that Mearns Acceptance was a private group of investors that would deal only with him directly.  The reason is that Mearns Acceptance was a one-person company.  And that one person was Mr. Gentry, who treated the company as an extension of himself.  He controlled Mearns Acceptance's voting shares.  The account with Thomson Kernaghan was opened by Mr. Gentry (again through his alias Don Williams).  And a "Mearns Acceptance Corporation Sole Director Resolution" which, just like it sounds, is a resolution adopted by a corporation's only director, delivered to Thomson Kernaghan represented that Mearns Acceptance was a one-person company with Don Williams--a.k.a. Mr. Gentry--as its sole signing officer and director.  Mr. Gentry himself also wrote a letter from Mearns Acceptance to a third party about the sale of UniDyn stock. We would be pressed to find that there was any sort of separation between Mearns

**[\*45]** Acceptance and Mr. Gentry.  But, again, the most important fact is that he used Mearns Acceptance to perpetrate tax evasion and a host of other crimes.

We, therefore, find it more likely than not that Mearns Acceptance was also an alter ego of Mr. Gentry.

### iii.    Prime Security

Prime Security's account was opened by Mr. Gentry (once more through his alias Don Williams).  A Prime Security sole-director resolution delivered to Thomson Kernaghan stated that Prime Security was a one-person company and that Don Williams--a.k.a. Mr. Gentry--was its sole signing officer and director.  Mr. Gentry possessed the corporate seal of Prime Security.  And Mr. Gentry moved funds from the Thomson Kernaghan account to other accounts that he controlled for no consideration.  Mr. Gentry even wrote a letter between Prime Security and "Don Williams" to transfer money to a bank account in Montreal, which he used to commit tax evasion and other crimes.  See Butler Law Firm, 410 P.2d at 1229.

We therefore find it more likely than not that Prime Security was the alter ego of Mr. Gentry.

**[*46]**                iv.      <u>Universal Dynamics</u>

Mr. Gentry also controlled Universal Dynamics.  During 2000 he was an officer and its CEO.  He possessed the corporate seal.  He had personally guaranteed loans for the corporation.  Mr. Gentry held out to others that this was *his* corporation.  He owned 100% of its shares, but kept on his computer a list of Universal Dynamics' "shareholders" that turned out to be a list of aliases that he used to disguise his sole ownership.  And, as with his other corporations, Mr. Gentry used Universal Dynamics in 2000 to commit tax evasion and other crimes.

We find it more likely than not that Universal Dynamics was the alter ego of Mr. Gentry.

B.      <u>Calculating the Gain</u>

That leaves the math problem of just how much capital gain Mr. Gentry realized from his use of these corporations.  The transactions left a well-lit paper trail for us.  We summarize here:

**[*47]**

| UniDyn stocks | Stock basis | Stock sales | Commissions | Other costs | Gains |
|---|---|---|---|---|---|
| Marriott Invest-ment | $378,497 | $2,437,260 | ($35,307) | ($310,379) | $1,713,079 |
| Mearns Accep-tance | 124,414 | 485,188 | (9,710) | (65,472) | 285,592 |
| Prime Security | 511,410 | 4,939,073 | (99,085) | (71,421) | 4,257,157 |
| Universal Dynamics | 96,750 | 1,896,267 | (39,818) | (124,679) | 1,635,020 |
| Total | 1,111,071 | 9,757,788 | (183,920) | (571,951) | 7,890,846 |
| Capital loss carryover | | | | | (76,975) |
| Capital gain | | | | | 7,813,870 |

These capital gains should be included in Mr. Gentry's 2000 taxable income.

C.  Mr. Jenkins

The Commissioner determined that Mr. Jenkins received about $500,000 for services that he provided to UniDyn or Mr. Gentry.  He argues that Mr. Jenkins received this money through a pair of Monex accounts and an Arizona corporation

**[\*48]** named SB 1504 Limited. Mr. Jenkins doesn't dispute the amount, but does dispute that this amount is taxable to him.

### 1. Monex Accounts

There are two Monex accounts at issue. The first (Monex 1) was opened in March 2000 in the name of "Advantage Strategies c/o Randy Jenkins." In the description of the account, Mr. Jenkins said it was for a single owner and not commercial. He also represented that he was self-employed. One day later, $310,379 was wired to Monex 1 by Randy Jenkins PC.

The second account (Monex 2) was opened on September 13, 2000, in Mr. Jenkins's own name. As with Monex 1, Mr. Jenkins represented that he was self-employed. He represented that this, unlike Monex 1, was a commercial account for the Advantage Business Trust--another name Jenkins used for Universal Dynamics. In September 2000, $71,421.40 was wired to Monex 2.

The funds that ended up in Monex 1 and 2 started in Mr. Gentry's brokerage accounts in Canada and passed through accounts titled to Verde v. Oro Trust ($71,421.40) and Mr. Jenkins's own attorney trust fund ($310,379). For both of these accounts, we need not look to alter-ego law--we find that Mr. Jenkins owned these accounts, and therefore the money received in them were his income.

**[*49]** Monex 1 was owned by Mr. Jenkins directly, even though on paper it was titled to "Advantage Strategies." Advantage Strategies is a sole proprietorship.[24] A sole proprietorship isn't a separate legal entity--it is merely a name in which an individual, who is the real owner, does business. See, e.g., Jeroski v. Fed. Mine Safety & Health Review Comm'n, 697 F.3d 651, 652 (7th Cir. 2012). On the application for the Monex account, Mr. Jenkins said that this wasn't a commercial account, and he listed himself as its single owner. We therefore find it more likely than not that Mr. Jenkins personally owned Monex 1.

We likewise find that he personally owned Monex 2. This account was opened in Mr. Jenkins's own name. Monex 2 issued the Form 1099-B directly to Mr. Jenkins. Mr. Jenkins says it was for something called Advantage Business Trust, but failed to produce any "trust" documents to either Monex 2 or us. We find that Mr. Jenkins directly owned Monex 2.[25]

---

[24] Advantage Strategies lacked an employer identification or taxpayer identification number. By its name, we know it is not a corporation or an entity with limited liability. And since there was only a single owner, it must by default be a sole proprietorship.

[25] We don't find Mr. Jenkins's testimony that this account was for payroll credible. There is nothing in the record to support this claim.

[*50] Since both Monex 1 and 2 are just Mr. Jenkins's personal accounts, the two transfers into the account are ordinary income for services performed.[26]

### 2. SB 1504 Limited

In October 2004 three Ford vehicles were bought for a total of $124,679 in the name of SB 1504. Mr. Jenkins negotiated their purchase, and the money for them came from Mr. Jenkins's PC AZ Bar Foundation Trust account. We find that this money also came from Mr. Gentry's Canadian accounts. The Commissioner argues that SB 1504 was Mr. Jenkins's alter ego,[27] and therefore the value of the three vehicles that were placed in that company's name should be included in his income.

Was SB 1504 Limited an alter ego of Mr. Jenkins? There will be no surprises here. Mr. Jenkins created SB 1504. He controlled the corporate documents and executed the signature card for SB 1504. There is no indication that this entity did any business of any sort. He and his family retained possession of three vehicles that were bought in its name. They used them for only their

---

[26] Our finding means Mr. Jenkins owes self-employment tax on this income as well. See sec. 1402; Parker v. Commissioner, 2002 WL 31818019, at *4-*5.

[27] Arizona law still applies. SB 1504 is an Arizona corporation, and our analysis is the same as that for Universal Dynamics and Mr. Gentry. See supra p. 46.

[*51] personal purposes. And SB 1504 was an instrumentality for Mr. Jenkins's own tax evasion and other crimes. We find SB 1504 was Mr. Jenkins's alter ego, and the money spent on the cars placed in SB 1504's name is his income received for services rendered. That makes it ordinary income and triggers self-employment tax on it as well. See sec. 1402; Parker, 2002 WL 31818019, at *4-*5.

III.    Taxpayers' Counterarguments

Neither Mr. Gentry nor Mr. Jenkins really engaged the Commissioner's substantive arguments, but instead came up with some unusual arguments which we briefly address.

Mr. Gentry argues that we can't determine a deficiency in his case because his criminal case is *res judicata*. There's well-settled precedent, however, that civil tax liability can be tried after a criminal judgment. See, e.g., Gillum v. Commissioner, T.C. Memo. 2010-280, 2010 WL 5393884, at *6-*7, aff'd, 676 F.3d 633 (8th Cir. 2012). Criminal judgments have no *res judicata* effect because criminal trials can't determine deficiencies.

Mr. Gentry also argues that he and Mr. Jenkins were convicted for international money laundering pursuant to 18 U.S.C. sections 1956 and 1957. He's right about that, and he's also right that their convictions required them to

**[\*52]** forfeit to the United States all property involved in each offense. 18 U.S.C. sec. 981(a)(1)(A), (f) (2006). Under this section, the property at issue became the property of the federal government immediately upon conviction of the crime that led to its forfeiture. Mr. Gentry argues that this means the proceeds of his crimes can't be taxable income in 2000 because they were forfeited to the federal government in 2000 under the criminal statute. This is a clever argument, but it is not a new one. It is also wrong. Courts consistently hold that forfeited money is includible in income to keep the forfeiture's "sting".[28] See Bailey v. Commissioner, T.C. Memo. 1989-674, 58 T.C.M. (CCH) 1030, 1032 (1989) (and cases cited).

Mr. Jenkins's most unusual argument is about the true value of coins and metals that he bought with money in his Monex 1 and 2. We need not get into this: The Monex statements show that there were cash deposits into the accounts. We've already found that these were Mr. Jenkins's accounts. What he did with the money that ended up in these accounts doesn't matter.

---

[28] Mr. Gentry also argues about the burden of proof, but that's no consequence in cases like these, where we were able to decide all issues of fact based on the preponderance of the evidence. See, e.g., Murphy v. Commissioner, T.C. Memo. 2006-243, 2006 WL 3257400, at \*2.

**[\*53]** The second argument that Mr. Jenkins makes is that he is entitled to a theft loss because coins were stolen from his home. A theft loss is a miscellaneous itemized deduction. Secs. 67, 165. To claim itemized deductions a taxpayer must make an affirmative election to do so. Sec. 63(e)(1). And a taxpayer must file a return to make this election. See Zaklama v. Commissioner, T.C. Memo. 2012-346, at \*70-\*71; Jahn v. Commissioner, T.C. Memo. 2008-141, 2008 WL 2128229, at \*1, aff'd, 392 F. App'x 949 (3d Cir. 2010). Even if Mr. Jenkins had a theft loss, he couldn't use it here because he never filed a tax return for 2000.

IV.   Conclusion

The Commissioner pretty much wins across the board here. Because the amounts differ slightly from the amounts in the notices of deficiency,

Decisions will be entered under

Rule 155.